Argued November 22; reversed December 30, 1932; rehearing
denied January 17, 1933

# STATE *v.* MOLTZNER

(17 P. (2d) 555)

*John W. Kaste,* of Portland (C. W. Robison, of Portland, on the brief), for appellant.

*Barnett Goldstein,* Special Assistant Attorney General (Lotus L. Langley, District Attorney, of Portland, on the brief), for the State.

KELLY, J. The salient facts in this case are not seriously disputed. The Guardian Building & Loan Association is a corporation organized under the statute regulating the organization and management of building and loan associations. The Mortgage Investment Company is a corporation incorporated under the general laws of this state and is not a building and loan association. In November, 1930, defendants were officers of both corporations.

On July 1, 1927, an agreement in writing was executed by both corporations of which the following is a copy:

"Portland, Oregon, July 1, 1927.

"This agreement made and entered into by and between the Guardian Building & Loan Association, a corporation, and the Mortgage Investment Company, a corporation, Witnesseth:

"In consideration of the mutual covenants and agreements hereinafter recited, the Guardian Building & Loan Association, hereby grants to the Mortgage Investment Company the exclusive privilege to loan all moneys of said association on hand from time to time for the purpose of investment in accordance with the laws governing the investment of said association's funds. Said association further agrees to pay to Mortgage Investment Company any and all membership fees earned by said association and paid to it in the sale of its stock.

"Said association further grants to the Mortgage Investment Company the right to place any and all insurance on the loans made with said association's money together with any and all other kinds of insurance which said association may or can control.

"The Mortgage Investment Company in consideration of the foregoing, hereby agrees to pay any and all operating expenses of the Guardian Building & Loan Association in excess of the sum of 2½ per cent of the average amount of the assets of said association or the minimum as provided for by Oregon Law. Said operating expenses are defined by Chapter 267, Oregon Laws of 1925.

"The Mortgage Investment Company further agrees to supply suitable office quarters with sufficient competent help, including a sales manager and salesmen for the sale of said association's stock to diligently sell and dispose of said association's stock and to keep the money of said association loaned so that the net earnings of the money invested for said association on said loans shall not be less than seven per cent.

"This agreement is to continue in force for a period of ten years and may be renewed for a further term at the option of the Mortgage Investment Company.

"In Witness Whereof, the respective parties hereto have caused these presents to be signed by the respec-

tive officers acting under and by the authority of the respective boards of directors of said corporations.

"Guardian Building & Loan Association (Seal)

"By Homer V. Carpenter
President.

"By E. E. Fitzwater
Secretary.

"Mortgage Investment Company

"By Homer V. Carpenter
President.

"By E. E. Fitzwater
Secretary."

On or about June 30, 1930, an adjustment of accounts between these two corporations was had, and the Mortgage Investment Company executed its demand note in favor of the Guardian Building & Loan Association in the sum of $73,254.46; and as security, for the payment of said note, by an instrument in writing said Mortgage Investment Company assigned to the Guardian Building & Loan Association its interest in all sums to be derived from 2½ per cent of the average assets of said building and loan association. On the books of the two companies, thereafter credit was given the Mortgage Investment Company for $225,000, as the purchase price of a building in Portland. It is claimed by the defense that this item of credit paid the demand note above mentioned; and served to account for other moneys of the Guardian Building & Loan Association.

On November 14, 1930, the check, mentioned in the indictment, was issued and given by the Guardian Building & Loan Association, through its officers, to the Mortgage Investment Company. During the latter

part of May, 1931, when the building and loan association was taken in charge by the corporation commissioner, funds derived from the Guardian Building & Loan Association were in the possession of the Mortgage Investment Company in a large amount. The exact amount is not definite.

It is claimed by the state that the credit given for the building, above mentioned, was in excess of the amount for which credit should have been given to the extent of $105,000. It is also claimed by the state that on August 31, 1931, as shown by the books of the association, the amount of funds held by the Mortgage Investment Company belonging to the Guardian Building & Loan Association was in excess of $525,000.

The writer, without intending to impute guilt, thinks that a charge of embezzlement of the amount last named by the defendants, acting in concert with, or, in control of, both corporations would have enabled the state properly to present these facts to a jury; but the charge here is not one of embezzlement.

In effect, it is charged in the indictment that on November 14, 1930, the defendants, Moltzner and Fitzwater, as officers and in control of the funds of the Guardian Building & Loan Association, loaned $10,000 of such funds to the Mortgage Investment Company without taking any security therefor.

■ This alleged offense constitutes a crime by virtue of sections 25-307 and 25-334, Oregon Code 1930. Being only malum prohibitum, the element of intent is not involved therein.

Bearing in mind that the making of a loan is charged in the indictment, it is well to remember what a loan is. The word, loan, imports a borrowing of

money or other personal property by a person who promises to return it: *Nichols v. Fearson,* 32 U. S. (7 Peters) 103, 109 (8 L. Ed. 623, 625).

"A loan is made whenever the borrower receives money over which he exercises dominion, and which he expressly or impliedly promises to return": *First National Bank of Cordova v. Tjosevig,* 138 Wash. 231 (244 P. 736). Quoted in Ballentine's Law Dictionary, p. 767.

Among other things it is urged in the brief of defendant Moltzner, that:

"The court erred in not confining the evidence to the sole question at issue, to wit: Did Moltzner, as an official of the Guardian, wilfully, knowingly, and unlawfully loan ten thousand dollars of the funds of the Guardian on the 14th day of November, 1930, to the Investment Company, without demanding or requiring the security specified by law."

■ Mr. Fred Bruechert was the first witness to testify. Mr. Bruechert was employed by the Ham-Jackson Company in its advertising department. He testified that his company had caused advertising matter to be published for the Guardian Building & Loan Association and the Mortgage Investment Company. Three different newspapers containing large display advertisements and several issues of the Guardian News, a magazine devoted exclusively to advertising the two corporations involved herein, were received in evidence. At the inception of Mr. Breuchert's testimony, defendant objected thereto on the ground that Mr. Moltzner was not shown to have authorized and sanctioned such advertising, and, later, defendant moved to strike the testimony, but upon the promise of the Assistant Attorney General to connect it up, defendant's objection and motion to strike were overruled.

If defendants had been charged with having obtained money under false pretenses, some of this testimony might have been relevant; but when the question to determine was whether a loan had been made without security, the advertising matter of the parties to the transaction had no relevancy.

It might, and probably did, impress the jury that a great effort had been made to secure a large amount of money from many subscribers in various parts of the state; but this certainly did not tend to prove that a transaction had been consummated whereby the Mortgage Investment Company had received $10,000 of the Guardian Building & Loan Association's funds under an agreement to repay it.

In great detail, the methods alleged to have been employed by the building and loan association, in dealing with subscribers and prospective subscribers, were shown.

We quote the following excerpts from the testimony of witness Cochran, who testified in chief on behalf of the state:

"Q. You are familiar with the setup of a building and loan association, are you?

"A. Fairly well.

"Q. And what is the prime purpose of a building and loan association?

"A. To create thrift and build up thrift as savings and loan.

"Q. Build up savings for whom?

"A. For purposes of loaning money on mortgages.

"Q. But build up savings for whom?

"A. For the depositors.

"Q. Now then, these depositors, what was the arrangement under which these depositors were requested to deposit their funds with the Guardian Building & Loan Association. Just explain so the jury may

have an idea what the arrangement was, how those people were invited to put their money in this institution?

"A. Well, they had the privilege to take various classes of plans that we submitted to them. One was in particular that we sold the most of, was called Class B plan of $4.00 per month over 162 months, matured $1,000. It returned a six per cent return to them.

*    *    *    *    *

"Q. As I understand it, Mr. Cochran, to shorten this, the various plans contemplated different amounts of money to be paid per week per month and matured at different times?

"A. Yes, that is right.

"Q. What class of people would these plans attract?

"A. Well, principally the wage earner, the salaried person. It applied to a variety of people.

"Q. Did you sell any of these plans to prospective depositors and investors in the Guardian Building & Loan Association?

"A. Yes, sir.

"Q. And was there a general method of representation made to these people as to what they were to get for their money and how they were to get it and what the money was to be used for?

"A. Yes.

"Q. What was the representation that was made?

"A. We always instructed our salesmen, and I always instructed those that were investing with us, that they were placing money with us which in turn we placed in security, such as first mortgages on improved real estate. We had the permission to go as high as 66 2/3 per cent of the appraisement of the property on loans, but that our average loan was less than fifty per cent. And I believe our average loan was about fifteen hundred to about eighteen hundred dollars. That is the way we presented our proposition as a rule.

*    *    *    *    *

"Q. What was the principal keynote that was given to these depositors to attract them to deposit their money with the Guardian Building & Loan Association?

"A. Well, safety and interest.

"Q. Was safety stressed?

"A. Yes.

\* \* \* \* \*

"Q. Now was there any advertising campaign conducted under your directions to interest people to deposit their money with the Guardian Building & Loan Association?

"A. There was no advertising directly under me that was—that I remember of. There was some newspaper advertising—other than the folders we put out.

\* \* \* \* \*

"Q. I will ask you if at any time investors or depositors in the Building & Loan Association were approached to have their accounts switched into stocks of the Mortgage Investment Company?

"A. Yes.

"Q. And when was that?

"A. I believe it was in May, 1931, there were some accounts that were transferred into the Mortgage Investment Company; that is, a portion of the accounts prior to that, but they were not very many.

\* \* \* \* \*

"Q. Now Mr. Cochran, I will ask you specifically if up to May, 1931, you had ever heard or learned that the money of the Guardian Building & Loan Association was used by the Mortgage Investment Company in connection with its financing of the City Light Building?

"A. No, I did not.

\* \* \* \* \*

"Q. I will ask you if you know during that time that the money of the Guardian Building & Loan Association was used to purchase the equity in the Buyers Building?

"A. No.

"Q. I will ask you if at the time (November, 1930) during that month and for some time prior thereto and for some time thereafter you were not continuing to make the representation to prospective depositors and investors that their money was being loaned on first mortgages on improved real estate?

"A. Yes, sir.

"Q. Were you ever advised differently?

"A. No, sir."

This testimony might have been pertinent in a civil case of deceit based upon fraudulent representation, if, in fact, the representations were false, but, in determining whether a loan had been negotiated, it was irrelevant and at best tended to confuse the jury as to the actual issue before them.

Much of this irrelevant testimony was received without objection; but its presence in the record plainly discloses that the attitude of the prosecuting officer was that any irregularity, offense or misconduct, whether individual or corporate on the part of either of said corporations or either of the defendants herein, was properly admissible to prove that a loan had been made without taking security therefor.

It is now argued by the state that such a course was justified, because testimony of other similar offenses is admissible to show guilty knowledge on the part of Moltzner.

No similar offense is even remotely to be deduced from the advertising matter, the number of investors, the alleged representations made to them or the campaign of selling stock for the financing of a building venture in Seattle. In fact, practically all of the state's testimony in chief challenges and refutes its charge that a loan was negotiated.

There is a statement in the record elicited from defendant, Fitzwater, on cross-examination to the effect that loans were made. At most, this was the statement of an accomplice. Taking the two notes, one the demand note first mentioned, and the other note for $12,000, executed to the Guardian Building & Loan Association by the Mortgage Investment Company, to be, as indicated by the state, merely the means used to juggle accounts upon the books of the two companies so that the ledgers would not reflect the actual state of such accounts; and assuming, as argued by the state, that the McCallister note was executed and canceled in an effort to conceal the giving of a bribe, the record is barren of any instance of a loan in the sense that a payment of the amount advanced was contemplated by the parties or either of them. If the state desired to convict defendant of embezzlement, larceny by bailee, obtaining money by false pretenses, or wrongful conversion, it should have charged some such offense.

In its case in chief, the state sought to justify the admission of testimony concerning various transactions other than the one forming the basis of the charge in the indictment, on the ground that in certain cases evidence of other offenses is admissible.

There are five exceptions to the rule that evidence of other offenses than the one charged is inadmissible. They are stated in *State v. O'Donnell*, 36 Or. 222 (61 P. 892), and repeated in *State v. Start*, 65 Or. 178 (132 P. 512, 46 L. R. A. (N. S.) 266). In the case at bar the state relied and now relies upon the second exception there stated. This exception is stated thus:

"When the commission of the act charged in the indictment is practically admitted by the prisoner, who seeks to avoid criminal responsibility therefor by relying upon the lack of intent or want of guilty

knowledge, evidence of the commission by him of several independent offenses before or after that upon which he is being tried, and having no apparent connection therewith, is admissible to prove such intent or knowledge, which has become the material issue for trial.''

Intent or *guilty* knowledge is no part of the offense charged.

■ At one juncture of the trial during the presentation of the state's case in chief, reference was made to the theory of the defense, and the difficulty experienced in determining what it was. The real purpose of the trial, however, was the same in this as in all criminal cases, namely, to determine whether the state could prove its theory. The state's theory was that a loan had been made. The state held the affirmative upon that issue. Its proof thereupon should have been presented in its case in chief without regard to any theory of the defendant and without regard to whether defendant had any theory or not.

The burden was upon the state in its case in chief to prove that the transaction was a loan. When Moltzner testified that it was merely an advancement to a constituted managing agent under the contract of July 1, 1927, he was merely refuting that part of the state's case in chief tending to show that the transaction was a loan.

In the case at bar, the element of a loan consisting of an advancement to, and a promise, either express or implied, by the Mortgage Investment Company to repay the money advanced, was an important issue. Moltzner did not rely upon any lack or want of guilty knowledge. He testified that he was fully aware of all of the circumstances attendant upon the transac-

tion involved. If Moltzner had indicated that he did not know that the $10,000 had been advanced to the investment company, evidence of other advances of which he did have knowledge might have been admissible. If, too, he had said that he did not know that no security had been taken, evidence of other instances where security had not been taken, if within his knowledge, might have been admissible. He did neither. Under his own testimony, if the transaction was a loan, he violated the statute.

■ Before any witness had been called, the Assistant Attorney General offered a printed pass book in evidence. This was objected to by defendant on the ground that it was incompetent, immaterial and not within the purview of any of the issues set forth in the indictment. At this point, the Assistant Attorney General said:

"If the court please, the purpose of this is to show the nature of the business done by the Guardian Building & Loan Association and the representations and statements therein contained made to the investors and depositors and it is preliminary to the evidence as it will be presented, so that it may be thoroughly understood. I think we have a right to show the method of doing business by the Guardian Building & Loan Association and the representations made by them in connection with this case."

The court then overruled defendant's objection and received said pass book in evidence. The defendant saved an exception. Another pass book was then offered, objected to by defendant; the court, upon inquiry, was informed by the Assistant Attorney General that this second pass book was offered upon the same theory as that upon which the first one had been received, and, thereupon, the objection of defendant was overruled. To this, defendant duly excepted.

■ A purported form of application was then offered, objected to on the ground that "it is not a properly certified copy." The court overruled the defendant's objection and received it in evidence.

There is no rule of law known to the writer where a document, not in any way identified or authenticated, becomes competent evidence upon the mere unsworn statement of the attorney offering it.

One of these exhibits contains alleged rules and regulations governing deposits and withdrawals in the Guardian Building & Loan Association, and the other contains purported rules and regulations, and bears the statement, "six per cent compounded semi-annually with safety," also, "ninety per cent of the withdrawal value may be borrowed at any time," and also, "save all you can—the more you deposit, the greater is your profit and the sooner you will attain your goal." Likewise, "How few of us are on Easy Street, yet we all want to get there."

The third document, just mentioned, namely, the application known to the record as state's exhibit F, is a blank form of application for membership in said building and loan association and a subscription for —— shares of its class——, guaranteed maturity investor's stock. This form of application contains the following clause:

"In case of my absence I hereby constitute and appoint the acting president and/or the attorney and counselor of the Guardian Building & Loan Association my attorney-in-fact to vote as my proxy at all annual and special meetings of the association."

This clause bears upon the question of the control of the association. One of the issues herein arises because of the charge in the indictment that defendants

had control thereof. Admitting incompetent testimony on that issue certainly was prejudicial error.

Except that the last mentioned exhibit tends to show that by means of proxies defendant Fitzwater was in control of the association, these three exhibits shed no light whatever upon the question of whether defendants loaned the money of the building and loan association without taking security therefor. The objections to their introduction should have been sustained.

■ In rebuttal, much testimony, in fact two hundred and seventy-nine pages thereof, was introduced, which the court received in order to determine whether or not the transaction in question was a loan. It is true the state urged then and urges now that this testimony, tending as it does, to show other alleged offenses, is admissible to show guilty knowledge. To sanction such a procedure would be to violate two important rules of practice, namely: (1) That in a criminal case the state must prove the essential elements of the crime charged in its case in chief, and cannot be permitted to do so in rebuttal; and (2) that testimony of offenses distinct from the one charged is inadmissible, except in cases coming within the five well known exceptions stated in the cases heretofore mentioned.

The writer is impressed with the embarrassment under which defendant's counsel conducted the defense herein, due to the erroneous rulings adverse to defendant made by the trial court at the inception of the case. Constant, ineffective objection estranges a jury; and, while many rulings of the court upon objection of defendant were had, disclosing reversible error, much irrelevant, immaterial and prejudicial testimony was received without objection.

While testifying in his own behalf, the defendant referred to the contract first herein set out. This con-

tract had been in the custody of the corporation commissioner for more than three years prior to the date of the alleged offense charged in the indictment. Defendant testified, in effect, that the transaction in question was merely a remittance of money made pursuant to the terms of that contract.

We pause to say that the present corporation commissioner, Mr. Mott, assumed his office as such commissioner after the date of the alleged crime charged in the indictment.

The state had had its opportunity, in presenting its case in chief, to show the nature of the transaction. In fact, it was the duty of the state to produce its testimony on that issue in its case in chief. The rebuttal should have been confined to a showing that the contract in question was not in effect, for certainly, if it was effective, the advancement of money under its terms could not be deemed to be a loan. The assignment of the 2½ per cent commissions to secure the demand note was a recognition rather than a rescission of said contract.

Apparently, the state lost sight of the issues presented by the indictment and defendant's plea of not guilty, and assumed that the derelictions and shortcomings of the Mortgage Investment Company were pertinent and relevant. No charge of misfeasance, malfeasance or nonfeasance, on the part of the latter corporation, is made in the indictment and testimony thereof was wholly extraneous and inadmissible. Upon a properly drawn indictment charging embezzlement, committed through control and management of both corporations, we would not be compelled to so hold.

In this case, whether defendant actually is a fiend or a fairy, an imp or an angel, we are constrained to

hold that he was entitled to a trial in accordance with approved rules of law. We are convinced that he did not have such a trial.

Other questions were submitted herein, which we deem unnecessary to decide, because of the conclusions herein expressed.

For the reasons stated, the judgment of the circuit court is reversed.

BEAN, C. J., BROWN and BELT, JJ., concur.

RAND, J., did not sit.

CAMPBELL, J., concurs in the result.

---

ROSSMAN, J. (dissenting). The defendant did not raise the objections to the admission of evidence in the circuit court which he has urged upon us. Some of the evidence came in with his approval.

I dissent.