[L. A. No. 18520.   In Bank.   Dec. 15, 1943.]

CROWN FINANCE CORPORATION (a Corporation), Respondent, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Appellant.

[L. A. No. 18521.   In Bank.   Dec. 15, 1943.]

WASHINGTON FINANCE COMPANY (a Corporation), Respondent, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Appellant.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, and H. H. Linney, Assistant Attorney General, for Appellant.

Benjamin, Lieberman & Elmore for Respondents.

CARTER, J.—Plaintiffs were successful in the trial court in these actions to recover franchise taxes paid under protest. The actions were consolidated for trial.

The trial court found that each plaintiff, a corporation, was engaged solely in the business of purchasing conditional sales contracts and accounts from neighborhood retail dealers in personal property consisting chiefly of household furniture and furnishings, and with respect to plaintiff, Crown Finance Corporation, also clothing. The latter corporation

will be referred to herein as Crown. The taxes were levied on Crown for the years 1937, 1938, 1939 and 1940, and on Washington Finance Company, referred to herein as Washington, for the years 1939 and 1940, pursuant to the Bank and Corporation Franchise Tax Act (Stats. 1929, p. 19, as amended; Deering's Gen. Laws, 1937, Act 8488). They were classified under that act as financial corporations and the tax rate was fixed at 8 per cent. (Stats. 1929, p. 19, sec. 4a, as amended.)

The trial court found that neither of the plaintiffs is a bank, national or otherwise, a financial corporation, or engaged in business in substantial competition with national banking associations. Defendant challenges that finding as being unsupported by the evidence with respect to competition. It contends that even if plaintiffs are not engaged in competition with national banks they are financial corporations; and that under the Bank and Corporation Franchise Tax Act it need only appear that plaintiffs are financial corporations, that is, moneyed corporations or dealers in money, without regard to whether their business competes with national banks.

The classification "financial corporations" in the Bank and Corporation Franchise Tax Act was made for the purpose of complying with the federal statute (42 Stat. 1499; 12 U.S.C.A., sec. 548) prohibiting discrimination in taxation between national banks and financial corporations, and the term was used in the same sense as in the federal statute. Section 1 of the Bank and Corporation Franchise Tax Act imposes a franchise tax on national banking associations according to or measured by their net income at the rate fixed by section 4a. Section 2 fixes a tax on other banks on the same basis and rate. Section 4 provides for a tax on "financial corporations" taxable under the provisions of article XIII, section 16, of the California Constitution, according to or measured by their net income at the rate specified in section 4a. (That section also imposes a tax of 4 per cent on corporations, with certain exceptions, other than financial corporations.) The rate set by section 4a is limited to 8 per cent; it is calculated with relation to the rates for other corporations and the taxes paid on personal property by such corporations. The taxes levied on banks are in lieu of all other taxes except real property taxes. (Sec. 3.) Financial corporations are permitted to offset against the franchise tax, other taxes paid, with certain exceptions as provided in the

act. (Sec. 4.) Article XIII, section 16, of the Constitution provides for the taxation of banks according to or measured by their net income; that the Legislature may provide for any other form of taxation now or hereafter permitted by Congress respecting national banks, provided the form chosen shall apply to all banks; and that the Legislature may provide for the taxation of corporations "by any method *not prohibited by this Constitution or the Constitution or laws of the United States.*" (Emphasis added.) It is indicated by the foregoing that the object is to avoid conflict with the United States Constitution and laws, hence the Bank and Corporation Franchise Tax Act has the same object. The purpose of the act was stated by this court in *H. A. S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d 518, 520 [133 P.2d 391, 145 A.L.R. 349]: "Financial corporations are classed with banks both national and state in order that the tax burden they must bear shall not be less than that of banks, and thus in harmony with the federal statute. . . . The manifest purpose of the Legislature in establishing the classification 'financial corporations' was to avoid the tax discrimination denounced by the federal statute." (See, also, *Morris Plan Co.* v. *Johnson,* 37 Cal.App.2d 621 [100 P.2d 493].)

The federal statute involved reads: "The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with: 1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause. (b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: . . . (c) In case of a tax on or according to or measured by the net income of an association, the taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor

higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits: . . ." (12 U.S.C.A., sec. 548.) The state act adopts the fourth method mentioned in the federal act. (Stats. 1929, p. 19, sec. 1, as amended.) Inasmuch as financial corporations are taxed the same as banks, and the method for the latter is the one specified in the federal statute, the implication follows that financial corporations were so designated to avoid the charge of discriminating against national banks, and that the basic test of financial corporations should be the same under both laws. That view is further fortified by the history of bank and corporation franchise tax legislation (see *Union Oil Associates* v. *Johnson,* 2 Cal.2d 727 [43 P.2d 291]), and the investigation and reports of the tax commission and tax research bureau. (See Final Report California Tax Commission [1929]; Summary Report of California Tax Research Bureau [1932].)

■ Neither the federal statute nor the state act defines the term "financial corporations." However, in the federal act, in the case of a tax on national bank shares as distinguished from a tax measured by or according to the income, it is provided that the tax may not be greater than upon moneyed capital coming into competition with the business of national banks. (12 U.S.C.A., sec. 548, clause 1(b).) That clause is interpreted to mean that: "The purpose of the restriction is to render it impossible for any State, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking." (*First Nat. Bank* v. *Anderson,* 269 U.S. 341, 347 [46 S.Ct. 135, 70 L.Ed. 295].) Inasmuch as the broad purpose of the restriction in the federal statute on state taxation of national banks is to prevent discrimination between national banks and financial corporations (see *Tradesmens [Nat.] Bank* v. *Tax Comm'n,* 309 U.S. 560 [60 S.Ct. 688, 84 L.Ed. 947]), and there would not likely be any discrimination where the financial corporations were not competing with national banks, we believe that a corporation may not be classed as financial under the state act unless it is in substantial competition with the business of national banks. Moreover, financial corporations being placed in a special class without definition, the other portions of the

federal statute (12 U.S.C.A., sec. 548, clause 1(b)), which refer to activities similar to those customarily associated with corporations engaged in financial business, should control. The reference in section 548, clause 1(b), is to "moneyed capital." ■ The word "financial" when used with reference to corporations indicates dealing in money as distinguished from other commodities. (*Morris Plan Co.* v. *Johnson, supra,* p. 624.) The distinguishing feature between "mercantile, manufacturing, and business" corporations mentioned in section 548 and financial corporations would therefore appear to be the dealing in moneyed capital. It is reasonable to assume that discrimination would not be present unless the financial corporation was competing with national banks. This is indicated in the above quotation from *First National Bank* v. *Anderson,* 269 U.S. 341, 347 [46 S.Ct. 135, 70 L.Ed. 295].

The question then becomes one of whether the evidence was sufficient to support the finding that plaintiffs were not financial corporations and were not engaged in competition with national banks. Viewing the evidence most favorable to plaintiffs, the record shows the following: Plaintiffs were engaged exclusively in purchasing at a discount conditional sales contracts of household furnishings and other low price articles of personal property from small local retail sellers of those articles under such contracts. They never made loans. From 1937 to 1941 the percentage of such contracts purchased by Crown without recourse to the seller thereof increased from 60 per cent to 100 per cent, while Washington took most of its contracts with recourse. The period of deferment of payment in the contracts ran from six months to two years. A carrying charge was added to the contract by the retail merchant before the sale of the contract. Plaintiffs required credit references and information from the buyers named in the contracts, which must meet their approval before they would purchase the contracts. Usually the dealer would require that approval before it would sell the merchandise on credit. The Crown's business volume was $900,000 to $1,100,000 a year since 1938; that of Washington was $300,000 to $325,000. No part of the payment to the dealer for the contracts was withheld as a reserve to protect plaintiffs if the credit buyer defaulted.

From the testimony of an officer of a national banking association doing business in the same area as plaintiffs, it

appears that it makes personal loans in substantial amounts for the purchase of household equipment, but solely on the borrower's credit, not taking the furniture as security; that it commenced purchasing, at a discount, conditional sales contracts from dealers in household equipment in 1937, and has a substantial business in that field, but in purchasing such contracts it relies solely upon the credit of the dealer rather than the buyer named in the contract, taking all contracts with recourse, withholds payment to the dealer of 20 to 40 per cent of the price as a reserve against default under the contract, does not repossess the property sold for a default under the contract, and requires the dealer to take up the contracts in default; that its business is in the nature of a loan or advance to the dealer and is not similar to the business carried on by finance companies who purchase conditional sales contracts without recourse or without withholding the reserve.

The only reasonable conclusion from that evidence is that plaintiffs were in substantial competition with national banks. Both national banks and plaintiffs are engaging in the same general investment business, that is, a business where the dealing is in moneyed capital as distinguished from other commodities, and purchasing at a discount conditional sales contracts from retail dealers in household furnishings and equipment. While in all phases of the business of each there is not a parallel, that is, plaintiffs do not loan money whereas national banks do, competition may exist although it does not extend to all aspects of the business of national banks. (See *Boise City Nat. Bank* v. *Ada County*, 48 F.2d 222; *National Bank of Commerce* v. *King County*, 153 Wash. 351 [280 P. 16]; *Public Nat. Bank of New York* v. *Keating*, 47 F.2d 561, aff'd 284 U.S. 587 [52 S.Ct. 137, 76 L.Ed. 507]; *Minnesota* v. *First National Bank*, 273 U.S. 561 [47 S.Ct. 468, 71 L.Ed. 774]; *First National Bank* v. *Hartford*, 273 U.S. 548 [47 S.Ct. 462, 71 L.Ed. 767]; *First Nat. Bank* v. *Anderson*, *supra*, p. 348.) It is true that it was testified that the business of the national banks and plaintiffs was not similar, for the reason, however, that, contrary to plaintiffs' course of business, the national banks looked only to the dealer's credit, insisted upon recourse to the dealer, and required a reserve. The last-mentioned differences in the mode of transacting the business of investing in instruments calling for the payment of money by purchasing of conditional sales contracts, are not con-

trolling. It cannot be doubted that for that class of business both plaintiffs and the national banks are interested in at least that group of dealers who are financially responsible and whose credit standing is sufficient to make acceptable and valuable their guarantee of payment on the contract, and who can afford to have the reserve withheld. The fact that plaintiffs deal chiefly with small local dealers does not preclude the assumption that some of those dealers may be in a position to deal with a national bank, or that national banks will accept such business when offered. It is not logical to say that where two concerns are engaged in trading in a similar commodity (money and conditional sales contracts in the instant case) they are not in competition because one offers more favorable terms or prices than the other.

*First National Bank of Shreveport* v. *Louisiana Tax Commission*, 289 U.S. 60 [53 S.Ct. 511, 77 L.Ed. 1030, 87 A.L.R. 840], is not contrary to these views. The first part of the opinion was concerned with discrimination under the Fourteenth Amendment to the Constitution of the United States and merely held in that connection that there was a basis for a distinction between banks and other corporations loaning money, in that banks used deposited money and the others did not. In regard to small loan and finance companies, the court stated, in concluding that there was no competition with national banks, at page 66: " 'And that [there is no competition with national banks] is true also of the so-called finance and securities companies, whose business is to lend money on long series of notes given for the price of automobiles, refrigerators, radios, etc., and secured by chattel mortgages. The national banks would never handle such business. They prefer to—and do in fact—lend to such companies.' These findings are supported by the record." The record in the instant case discloses that national banks do a substantial business in purchasing conditional sales contracts of the same character as those bought by plaintiffs. (See *Morris Plan Co.* v. *Johnson, supra.*) Other cases cited by plaintiffs involve situations in which national banks were not, as in the case at bar, engaged in the same class of small loan business based upon conditional sales contracts. The cases in this state hold that finance companies are financial corporations within the purview of the Bank and Corporation Franchise Tax Act when they engage in business in competition with national banks. (*H.A.S. Loan Service, Inc.* v. *McColgan, supra; Mor-*

*ris Plan Co.* v. *Johnson, supra.*) The only difference between the instant case and those last cited is in the terms upon which the same class of transactions are handled by the respective competitors for the business. That, as we have seen, is not controlling.

The judgments are reversed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., and Schauer, J., concurred.

Traynor, J., did not participate.