Argued January 8, affirmed August 14, 1962

# GENERAL ELECTRIC CREDIT CORPORATION *v.* STATE TAX COMMISSION

373 P. 2d 974

*Donald H. Burnett,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the brief were Robert Y. Thornton, Attorney General, John C. Mull, and Carlisle B. Roberts, Assistant Attorneys General, Salem.

*Samuel B. Stewart,* Portland, argued the cause and filed the brief for respondent.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by the State Tax Commission from a decree of the circuit court which held invalid an excise tax assessed against the plaintiff under ORS 317.060. The tax was assessed pursuant to a belief that the plaintiff is a "financial corporation" within the contemplation of the section of our laws just cited and as a deficiency for the year 1957. From the assessment an unsuccessful appeal was taken to the State Tax Commission. Later, the plaintiff appealed to the circuit court and January 13, 1961, the court entered findings of fact and conclusions of law which ruled that the deficiency assessment was unlawful and reversed the commission's order. From that ruling the commission has appealed to this court.

The plaintiff computed and paid its 1957 excise tax upon the premise that it is a "business corporation" taxable under ORS 317.070, and therefore subject to a rate of 6 per cent of net income. The commission, on the other hand, maintains that the plaintiff is a "financial corporation" taxable under ORS 317.060 and therefore subject to a 9 per cent rate. This difference of opinion gains added interest from the possibility that the plaintiff's interpretation of the act, if correct, means that the excise tax, insofar as it applies to national banks, violates federal law. ORS 317.060 (1) reads as follows:

"Every bank, other than a national banking association, and every financial corporation, build-

ing and loan association, savings and loan association and mutual savings bank, located within the limits of this state, shall annually pay to the state, for the privilege of carrying on or doing of business by it within this state, an excise tax according to or measured by its net income to be computed in the manner provided by this chapter at the rate of nine percent."

The following is the material part of ORS 317.070:

"(1) Every centrally assessed corporation, the property of which is assessed by the State Tax Commission under ORS 308.505 to 308.730, and every mercantile, manufacturing and business corporation doing or authorized to do business within this state, except as provided in ORS 317.080 to 317.090, shall annually pay to this state, for the privilege of carrying on or doing business by it within this state, an excise tax according to or measured by its net income, to be computed in the manner provided by this chapter, at the rate of six percent."

The case was tried in the circuit court upon stipulated facts. The stipulation includes all facts found by the commission in its opinion and order of January 22, 1960, and affords a portrayal of the plaintiff's business activities. It was stipulated that the business consists "mainly" of two activities which were described as follows: "(1) The financing of the acquisition of inventory by General Electric dealers from General Electric distributors; (2) the purchasing of retail installment sales contracts from General Electric dealers." The first of these activities was accomplished by means of trust receipts and it was stipulated for purposes of the trial that this constituted "lending money" within the meaning of ORS 317.010 (10), a crucial definition subsection of ORS chapter

317 to which we will refer again. The words of ORS
317.010 (10) are:

> " 'Financial institution' or 'financial corpora-
> tion' means every corporation whose principal
> business is lending money in direct competition
> with national and state banks."

It was further stipulated, however, that the purchase
of retail installment sales contracts constitutes the
"principal" business of the company within the mean-
ing of ORS 317.010 (10). This is supported by a
summary of business operations which indicates that
87 per cent of the plaintiff's 1956 gross income from
the two sources was from installment sales purchases;
while 85 per cent of gross income for the tax year
1957, and 86 per cent of gross income for 1958 was
from this activity. It was further agreed that the
purchase of retail installment contracts by the plain-
tiff "operates directly in competition with national
and state banks within the State of Oregon within
the meaning of ORS 317.010 (10)."

Plaintiff's complaint alleges two causes of suit.
First, it alleges that it is a "business corporation"
under ORS 317.070, and had been unlawfully assessed
as a "financial corporation" under ORS 317.060.
Second, it alleges that the Oregon excise tax upon
national banks was repugnant to Section 5219 of the
Revised Statutes of the United States (12 USCA
§ 548) and therefore any attempt to tax the plaintiff
as a financial corporation would be a denial of equal
protection of the laws under the Fourteenth Amend-
ment to the United States Constitution and Article I,
§§ 20 and 32 of the Oregon Constitution. We will
shortly quote the material part of Section 5219.

The parties stipulated that the second cause of
suit should not be an issue in the circuit court. This

was on the understanding that several national banks had filed a suit in the circuit court for Marion County challenging the validity of the excise tax. It was agreed that the outcome of the Marion County suit would be determinative of the validity of ORS 317.060, and the parties stipulated to be bound by the outcome of the Marion County suit.

The only question before the circuit court, and now before this court, is whether the plaintiff, on the stipulated facts, is a "financial corporation" within the purview of ORS 317.060, supra.

In order to understand the position taken by the commission in this case, it is necessary to review briefly the history of federal and state legislation regulating state taxation of national banking associations.

National banks were established by the National Bank Act of 1864. June 3, 1864, chapter 106, 13 Stat 99. Congress surmised that the immunity from state taxation which the United States Supreme Court declared to apply to the second Bank of the United States in *M'Culloch v. Maryland,* 17 U S (4 Wheat) 316, 4 L Ed 579 (1819), would adhere also to the new banks, and therefore included in Section 41 of the Act a partial waiver, to permit limited taxation of such institutions by the states: 13 Stat 111. Shortly thereafter the validity of the waiver provision was upheld in *Van Allen v. The Assessors,* 70 U S (3 Wall) 573, 18 L Ed 229 (1866). The decision also necessarily implied that national banks could not be taxed by the states in the absence of congressional consent.

As amended by Act of February 10, 1868, chapter

7, 15 Stat 34, the waiver was codified in Section 5219, Revised Statutes of 1878 (RS 5219) which reads:

"Nothing herein shall prevent all the shares in any association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the state within which the association is located; but the legislature of each State may determine and direct the manner and place of taxing all the shares of national banking associations located within the State, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, and that the shares of any national banking association owned by non-residents of any State shall be taxed in the city or town where the bank is located, and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either State, county, or municipal taxes, to the same extent, according to its value, as other real property is taxed."

Significant for our purposes is the proviso that the tax on bank shares "shall not be at a greater rate than is assessed upon other moneyed capital." From an early period it was held that "moneyed capital" meant only that which was employed "in substantial competition" with the business of national banks. *Mercantile Nat. Bank v. New York,* 121 U S 138, 7 S Ct 826, 30 L Ed 895 (1887); *Bank of Redemption v. Boston,* 125 U S 60, 8 S Ct 772, 31 L Ed 689 (1888); *Commercial Nat. Bank v. Chambers,* 182 U S 556, 21 S Ct 863, 45 L Ed 1227 (1901); *First Nat. Bank v. Anderson,* 269 U S 341, 46 S Ct 135, 70 L Ed 295 (1925); *First Nat. Bank v. Hartford,* 273 U S 548, 47 S Ct 462, 71 L Ed 767 (1927). "Rate" was construed to define the entire assessment process. It

was, for instance, stated in *Stanley v. Board of Supervisors,* 121 U S 535, 30 L Ed 1000, 7 S Ct 1234 (1886):

"* * * the prohibition against discrimination has reference to the entire process of assessment, and includes the valuation of the shares as well as the rate of percentage charged."

In *People v. Weaver,* 100 U S 539, 25 L Ed 705 (1880), the court ruled:

"* * * Congress had in mind an assessment, a rate of assessment, and a valuation; and, taking all these together, the taxation on these shares was not to be greater than on other moneyed capital."

See Annotation, 59 ALR 10, 18. Thus, even though the mill rate of tax on national bank shares and competing capital might be identical, the state tax would be held invalid where the effect of the statutory scheme of taxation was to discriminate against national banks in favor of local capital, as in *San Francisco National Bank v. Dodge,* 197 U S 70, 25 S Ct 384, 49 L Ed 669 (1905), and *People v. Weaver,* supra; or where, although the tax statutes complied with federal legislation, state tax authorities could be shown to have deliberately discriminated against national banks in valuing property. *Pelton v. National Bank,* 101 U S 143, 25 L Ed 901 (1880). However, the decisions uniformly held that national bank shares and competing capital need not be taxed by identical methods so long as the difference did not result in discrimination. *Davenport National Bank v. Board of Equalization,* 123 U S 83, 8 S Ct 73, 31 L Ed 94 (1887); *Amoskeag Sav. Bank v. Purdy,* 231 U S 373, 58 L Ed 274, 34 S Ct 114 (1913); Annotation, 59 ALR 10, 16. "And so * * * in determining the

burden of the tax—its discriminatory character—we look to its *effect*, not its *rate." Michigan National Bank v. Michigan,* 365 U S 467, 81 S Ct 659, 5 L Ed2d 710 (1961).

In 1921, *Merchants National Bank of Richmond v. City of Richmond,* 256 U S 635, 65 L Ed 1135, 41 S Ct 619, held that the requirement of equality applied not only to state banks and comparable financial institutions, but also to other kinds of capital in competition with national banks. The decision disturbed tax authorities because it appeared to extend the requirement to types of capital which many believed had previously been exempted by decisions of the Supreme Court. See National Industrial Conference Board, The Taxation of Banks (1934) p 13. Previous to the Richmond case, the court had many times indicated that moneyed capital was not limited in definition to state banking institutions. See *First National Bank of Aberdeen v. County of Chehalis,* 166 U S 440, 41 L Ed 1069, 17 S Ct 629 (1897); *Boyer v. Boyer,* 113 U S 690, 5 S Ct 706, 28 L Ed 1089 (1885); *Mercantile National Bank v. New York,* supra, 121 U S 138, 7 S Ct 826, 31 L Ed 895 (1887). But the Richmond decision, while holding what previous decisions of the court had implied, was not clearly written and its implications were doubtful. One could reasonably infer from the opinion that any large aggregate of capital invested in bonds, notes and other evidences of indebtedness would be held to be in competition with national banks even though such capital might belong to numerous, unrelated small investors none of whom individually would be considered competitors of the banks.

The Richmond decision was in part responsible for a 1923 revision of RS 5219. The amended act

contained the following provision called forth by the decision:

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section." Mar. 4, 1923, 42 Stat pt 1, ch 267.

In 1926, *First National Bank v. Anderson,* 269 U S 341, 46 S Ct 134, 70 L Ed 295, in construing the amended act, held that the quoted part of the amendment made no change in the substantive law, but merely put into legislative language what previous decisions of the court had interpreted the act to mean. For a critical view of this decision, see 41 Harv L Rev 82, 85.

The 1923 revision of RS 5219 changed the law substantially in other respects. The former statute permitted taxation of the shares only of national banks. Under the revised act the states were permitted an election among three alternative methods of taxation. They could tax the shares, as before; or they could include dividends derived from the shares in the taxable income of owners or holders of the shares; or, most important, they could tax the income of the banks. With respect to income taxes the following provision was added to the statute:

"In case of a tax on the net income of an association, the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed

by the taxing State upon the net income of mercantile, manufacturing, and business corporations doing business within its limits."

The income tax provisions of the 1923 act probably reflected nationally a trend among the states in the direction of income based taxes.

In 1926, RS 5219 was amended to its present form. Act, March 25, 1926, chapter 88, 44 Stat 223; 12 USCA § 548. Omitting sections which are not material to the present controversy, the statute reads as follows:

"The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others  *  *  *

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.

"(c) In case of a tax on or according to or measured by the net income of an association, the

taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits * * *

"(d) In case the dividends derived from the said shares are taxed, the tax shall not be at a greater rate than is assessed upon the net income from other moneyed capital."

The 1926 amendment added a fourth option to the three taxes which the states were already empowered to levy on national banks. This was the tax "measured by net income." That formula permitted the states to levy excise taxes upon tax exempt government securities which could not be reached by an ordinary income tax under previous decisions of the Supreme Court. See *Flint v. Stone Tracy Co.*, 220 U S 107, 55 L Ed 389 (1911); *Tradesmens National Bank of Oklahoma City v. Oklahoma Tax Commission*, 309 U S 560, 60 S Ct 688, 84 L Ed 947 (1940). A large part of the income of national banks is derived from that source.

As we have already seen, RS 5219 places two important restrictions upon the power of the states to levy income taxes or taxes measured by income. The rate must not be higher than the rate assessed upon "other financial corporations," nor can it be "higher than the highest of the rates assessed upon mercantile, manufacturing, and business corporations." "Financial corporations" is not defined, and it has been argued that it should be interpreted in approximately the same way as "moneyed capital" elsewhere in the statute. *Crown Finance Corporation v. Mc-*

582

*Colgan,* 23 Cal2d 280, 144 P2d 331 (1943). There is no express provision that "financial corporations" are limited to those which are in substantial competition with national banks.

Oregon law reflects the changing requirements of RS 5219. The first statute dealing specifically with bank taxes in light of the federal act was enacted in 1870. Or L 1870, p 10. It provided simply: "All shares of the capital stock of banks located in this state shall be taxed, at their value to the owners thereof." See HC § 2734; 2 B & C §§ 3042; 3063-68. In 1907 a new act was passed, apparently upon the recommendation of the State Tax Commission made in its report of 1906. Or L 1907, chapter 265. Section 1 of the Act provided:

> "The stockholders or shareholders of every corporation bank located within this State * * * whether such bank be authorized for banking purposes under the laws of this State or of the United States, shall be assessed and taxed on the value of their shares of stock therein."

In the only two Oregon decisions dealing with bank taxation under the acts of 1870 and 1907, it was recognized that these statutes were intended to secure equality of taxation between the shares of state and national banks. *Ankeny v. Blakeley,* 44 Or 78, 74 P 485 (1903); *Citizen's Nat. Bank v. Board of Equalization,* 109 Or 669, 222 P 341 (1924). In 1928, however, Judge Robert Bean, then federal district judge for Oregon, held that the Oregon law violated RS 5219. *Brotherhood Cooperative National Bank v. Hurlburt,* 26 F2d 957 (1928). Undisputed evidence in the case showed that numerous "financial and investment corporations and individuals" competed with national banks and received tax advantages under existing

law. Hence, the decision of the district court was inescapable.

In response, the Oregon legislature enacted the comprehensive Corporation Excise Tax Act of 1929, Or L 1929, chapter 427. The share tax was abandoned and an excise tax was levied, the imposition being "according to or measured by net income." This act divided taxpayers into three categories: 1. national banking associations; 2. "every bank, other than a national banking association, and every financial corporation, building and loan association and mutual savings bank"; and 3. "mercantile, manufacturing and business" corporations. All three categories of taxpayers were assessed at a common rate of 5 per cent. However, mercantile, manufacturing, and business corporations were entitled to offset personal property taxes against the excise tax, not to exceed 90 per cent of the latter. National banks, state banks, financial corporations, building and loan associations, and mutual savings banks were exempted by the act from all other state, county, and municipal taxes except real estate taxes. It was necessary to make the exemption in the case of national banks since RS 5219 did not confer upon the states any authority to tax their personal property. The exemption granted to local banks and financial institutions either was based on constitutional grounds or was designed to insure that these businesses would not be placed at a competitive disadvantage.

In following years, the tax burden upon mercantile, manufacturing, and business corporations became proportionately heavier since the personal property tax offset was reduced to 75 per cent in 1933, Or L 1933 (Second Special Session) chapter 33, sec. 2; to 50 per cent in 1939, Or L 1939, chapter 489, sec. 2;

and to 33⅓ per cent in 1957, Or L 1957, chapter 607, sec. 3, chapter 709, sec. 1, ORS 317.070. Moreover, section 3 (2) a and b of the 1957 amendment limited the corporations qualifying for an offset to those "primarily engaged in manufacturing, processing or assembling materials into finished products for purposes of sale."

In an apparent effort to restore a balance between the tax burden paid by financial corporations and other businesses the 1957 assembly adopted the split-rate excise tax which is in controversy here.

Under the provisions of ORS 317.055, 317.060, and 317.070 which we have quoted, banks and other financial institutions are taxed at a rate of 9 per cent, and mercantile, manufacturing, and business corporations at 6 per cent. Since the latter corporations also pay personal property taxes, the requirement of RS 5219 that "the rate shall not be higher than the highest of the rates assessed by the taxing state upon mercantile, manufacturing and business corporations" is not necessarily disregarded so long as the federal courts continue to construe "rate" to mean the entire assessment process, and to refer to the practical burden of the tax rather than a bare numerical percentage. Whether the split-rate tax structure on its face violates RS 5219 is an issue in the Marion County proceeding to which we have already referred and the parties have stipulated to omit it from this case.

The foregoing background provides a better understanding of the issue in the present litigation. If the plaintiff is a "financial corporation" within the meaning of ORS 317.060, as the State Tax Commission contends, it is taxable exactly as national banks are taxed and the requirement of RS 5219 that "the

rate shall not be higher than the rate assessed upon other financial corporations" will be satisfied. The second requirement of RS 5219, that "the rate shall not be higher than the highest of the rates assessed by the taxing state upon mercantile, manufacturing and business corporations" will also be satisfied provided that personal property taxes paid by such corporations offset the preferential excise tax rate accorded to them.

If, however, the plaintiff is a "business corporation" within the meaning of ORS 317.010, a serious difficulty arises in attempting to reconcile the state tax scheme with federal requirements. As a matter of federal law, the plaintiff might well be deemed a "financial corporation" within the meaning of RS 5219. If, as the tax commission suggests (but does not undertake to prove), the personal property tax of corporations similar to the plaintiff will not amount to 3 per cent of their net income, then such corporations, if assessed as business corporations, will be taxed at a lower rate than that "assessed upon other financial corporations," in violation of RS 5219.

If "financial corporation" had not been defined by the legislature, we would feel required to hold that the plaintiff's activities brought it within the meaning of the term. As we have already observed, however, the term has the statutory meaning given it by ORS 317.010 (10):

> " 'Financial institution' or 'financial corporation' means every corporation whose principal business is lending money in direct competition with national and state banks."

The present definition was enacted in substantially the above language in 1933 by Oregon Laws (Second Special Session) 1933, chapter 33, sec. 1 (j).

It replaced a similar definition enacted at the regular 1933 session: Or L 1933, chapter 388.

"The term 'financial institution' or 'financial corporation' shall be construed to mean any corporation whose principal business is lending money."

A still earlier definition, enacted in 1931, Or L 1931, chapter 273, provided:

"The term 'financial institution' or 'financial corporation' shall be construed to mean any corporation whose principal source of income is derived from money or credits."

This was the first year in which a definition of "financial corporation" was included in our tax laws. The original excise tax of 1929 left the term undefined, and there was good reason for omitting a definition. In the 1923 and 1926 revisions of RS 5219, Congress did not undertake to define "financial corporation," leaving that task to the federal judiciary. The omission created difficulties for state legislatures. If they sought to include a definition in local revenue acts, subsequent federal court decisions defining the term inconsistently therewith could result in defeat for the state tax measures altogether. However, failure to define the term would result in ambiguity and uncertainty of application. See Traynor and Keesling, Recent Changes in the Bank and Corporation Franchise Tax Act, 22 Cal L Rev 499, 509.

The tax commission has been unable to discover any direct legislative history for the adoption of a definition of "financial corporation" although it surmises that fear of due process objections on grounds of vagueness may have prompted the legislature to act.

While the terms "financial corporation," and "mer-

cantile," "manufacturing," and "business" corporation have been a part of RS 5219 since 1923, they have not been defined by the federal courts. It has been suggested that there is a considerable overlapping of meaning, and that "business" corporations include all corporations organized for profit, of whatever character. Thus, "mercantile, manufacturing, and financial corporations are business corporations in the same sense that cats, dogs, and horses are animals." Traynor and Keesling, op. cit., 22 Cal L Rev 499, 502. It has been persuasively argued that "financial corporation" is properly construed, as "moneyed capital" elsewhere in the statute, to include only corporations which compete with national banks. Traynor and Keesling, op. cit., 22 Cal L Rev 499, 510; *Crown Finance Corporation v. McColgan,* 23 Cal2d 280, 144 P2d 331 (1943).

■ A corporation is in "competition" with the business of national banks if it is engaged in a business activity in which neighboring national banks also engage. We need not consider in this case whether competition may not also have a more inclusive meaning. See Traynor and Keesling, op. cit., 22 Cal L Rev 499, 512-513. Since the decision in *Merchants National Bank of Richmond v. City of Richmond,* supra, 256 U S 635, 41 S Ct 619, 65 L Ed 1135 (1921), it can no longer be argued that the corporation must be organized as a bank or carry on all the functions of a bank. "Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of § 5219, even though the competition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business."

*First National Bank of Hartford v. City of Hartford,* 273 U S 548, 47 S Ct 462, 71 L Ed 767 (1927); *Minnesota v. First National Bank,* 273 U S 561, 47 S Ct 468, 71 L Ed 774 (1927). Moreover, it is apparently not necessary that the national banks should have been actually engaged in the business activity at the time RS 5219 was enacted or revised. It must be assumed that the statute extends its protection to national banks as they pioneer fresh areas of finance. See *National Bank of Commerce v. King County,* 153 Wash 351, 280 P 16 (1929).

The Supreme Court of California has determined that a company engaged in the purchase of conditional sales contracts is a "financial corporation" within the meaning of RS 5219 and a California statute. *Crown Finance Corporation v. McColgan,* supra, 23 Cal2d 280, 144 P2d 331 (1943). An opposite result was reached in *People ex rel. Bankers Commercial Security Company v. Goldfogle,* 242 NY 545, 152 NE 420, 1926, affirming 213 AD 716, 211 NYS 120, 1925, decided at a time when banks were not buying commercial paper. In view of what we have already said, and in light of the stipulation of the parties that "competition" exists between the plaintiff and national and state banks, within the meaning of ORS 317.010 (10), the necessary conclusion is that the plaintiff is a "financial corporation" within the purview of RS 5219, if the competition is of a substantial character.

Decisions of the United States Supreme Court indicate that not only the fact of competition but the amount of money involved is to be considered in determining whether competition is substantial. Moreover, the test, apparently, is not whether the amount of competing capital is large in absolute terms but

whether it is large with respect to banking capital. As stated in *First National Bank of Hartford,* supra, 273 U S 548, 71 L Ed 767, 47 S Ct 462 (1927):

"Our conclusion is that § 5219 is violated whereever capital, substantial in amount when compared with the capitalization of national banks, is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage and in the same locality in which they do business."

The court said that to determine whether "substantial competition" existed in the case before it, it was "necessary to ascertain the nature and extent of the moneyed capital in the hands of individual citizens within the state and the relation of its employment, in point of competition, to the business of national banks." See also, *First National Bank of Garnett v. Ayers,* 160 U S 660, 16 S Ct 412, 40 L Ed 573 (1896).

The tax commission has presented three assignments of error. First, it alleges that the trial court erred in holding the plaintiff is not a "financial corporation" as the term is defined in ORS 317.010 (10). We conclude, however, that the trial court correctly construed the statute.

■ In support of this assignment of error the commission first contends that ORS 317.060 and ORS 317.010 (10) should be read in pari materia with RS 5219, and that, when so read, the plaintiff is taxable as a "financial corporation." It was, we may assume, the intention of the state legislature to comply with federal law. But the definition of "financial corporation" in ORS 317.010 (10) fetters any effort by this court to make state law accord with newly developing interpretations of RS 5219. Under the first assignment of error the only question we may

consider is whether, by a fair interpretation of the words used in ORS 317.010 (10), a corporation whose principal business is the purchase of conditional sales contracts from retail merchants—an activity stipulated to be in direct competition with national banks —is "lending money."

■ The commission insists the construction which it favors should be adopted for the further reason that this interpretation "preserves and gives effect to ORS Chapter 317" while the contrary interpretation would lead to "absurd and illogical results" and "tend toward unconstitutionality." In the course of this opinion we have already expressed some doubt that the plaintiff's interpretation of the statute would lead to the result feared by the commission, although the possibility certainly is not remote. Moreover, those of our decisions stating the customary rule that unconstitutional and illogical results are to be avoided in construing statutes go no further than to say that an act will be preserved if an alternative "reasonable" interpretation of the words used can be found. *State v. Harmon*, 225 Or 571, 358 P2d 1048 (1961); *Wright v. Blue Mountain Hospital District*, 328 P2d 314, 214 Or 141 (1958); *Spencer v. City of Portland*, 114 Or 381, 235 P 279 (1925). In other words, the interpretation adopted should not be one that distorts the statutory language. *State v. Jackson*, 224 Or 337, 356 P2d 495 (1960); *State v. McFall*, 112 Or 183, 229 P 79 (1924).

4. The purchase of conditional sales contracts is not a loan of money either in ordinary or legal understanding. This court has twice held that the purchase of such instruments does not constitute lending money for purposes of the usury laws, an area where the definition of a loan is most often in controversy.

*Coast Finance Corp. v. Ira F. Powers Furniture Co.,*
105 Or 339, 209 P 614 (1922); *Starker v. Heckart,*
200 Or 573, 267 P2d 219 (1954). It was decided in
these cases that the transaction "is a sale of a chose
in action and does not involve a loan of money." 200
Or 573, 575. In this Oregon follows the general rule.
To bring the discounting of negotiable or commercial
paper within the usury law, proof must be made that
the transaction is merely a facade for what is actually
a loan. Anno., 165 ALR 626, 663.

To lend is to "let out (money) for temporary use
on condition of return with interest." G. & C. Merriam
Co., Websters New International Dictionary (2d ed,
unabridged) 1415. "The word 'loan' imports a bor-
rowing of money or other personal property by a
person who promises to return it." *State v. Moltzner,*
141 Or 355, 17 P2d 555 (1932). "The word 'loan' im-
plies an obligation to repay." *Carson v. Olcott,* 209
P 610, 105 Or 259 (1922).

■ The policies underlying the usury law and those
underlying the tax law are different, and decisions
involving the interpretation of usury statutes are not
necessarily determinative of questions arising in the
field of taxation. But we do not believe that the
words "lending money" can be stretched far enough
to include a financing company's purchase of condi-
tional sales contracts from retail merchants. We as-
sume the plaintiff's operations are designed to pro-
mote retail sales by enabling retail dealers to sell on
liberal credit terms. The plaintiff could have accom-
plished the same result, one supposes, by making
direct cash advances either to customers or to dealers
selling on credit. But it did not do so, and the method
adopted lacks the elements necessary to constitute a
loan.

These considerations also answer the commission's contention that a statute intended to operate prospectively should be construed to include new situations within the general policy of the act. See *Pacific Elevator Co. v. Portland,* 65 Or 349, 133 P 72 (1913).

■ The commission next assigns as error the trial court's refusal to hold that the definition of "financial corporation" contained in ORS 317.010 (10) has been repealed by implication. The argument is based upon the fact that prior to the 1957 amendments to ORS chapter 317 it was not crucial for purposes of compliance with RS 5219 to define "financial corporation," since mercantile, manufacturing, and business corporations paid excise taxes at the same rate as financial corporations, and additionally paid personal property taxes from which financial corporations were exempt. Thus, any company which could qualify as a financial corporation would naturally do so. Only after the adoption of a split rate tax structure in 1957 was it possible for a company to gain a tax advantage by filing returns as a business corporation rather than as a financial corporation.

It is not possible to assess the motives of the legislature in permitting the definition of "financial corporation" in ORS 317.010 (10) to stand after the 1957 revision of the excise act. It may have been an oversight. But facts within the possession of the lawmaking body might have led it to the conclusion that the definition was at that time still broad enough to include all companies competing "substantially" with the national banks.

■ In any event, we do not believe that repeal by implication is to be inferred where there is no repugnancy between sections of the code. ORS chapter 317 may be unconstitutional, depending upon facts not

within the evidence before this court, but its provisions are not inconsistent, taken one with another. Repugnancy, not unconstitutionality, is the decisive factor in a repeal by implication. See, e.g., *State ex rel Washington-Oregon Inv. Co. v. Dobson,* 169 Or 546, 130 P2d 939 (1942); *Noble v. Noble,* 164 Or 538, 103 P2d 293 (1940); *Ulrich v. Lincoln Realty Co.,* 180 Or 380, 175 P2d 149; *Cabell v. City of Portland,* 153 Or 528, 57 P2d 1292 (1936); *Rorick v. Dalles City,* 140 Or 342, 12 P2d 762 (1932); 1 Sutherland, Statutory Construction (3d ed) § 2012.

The dangers of inferring an implied repeal are illustrated by the fact that the 1961 legislature expressly rejected a proposed amendment of ORS 317.010, the sole purpose of which was to delete the definition of "financial institution" and "financial corporation" in subsection (10) and to make the change retroactive to tax years beginning on or after January 1, 1957. Senate Bill 105, 51st Leg. Sess.; Legislative Calendar, 51st Leg. Sess. 33. In view of our decision, however, we need not pause to consider what conclusions, if any, can safely be drawn from the legislature's failure to enact this amendment. See *Southern Pacific Co. v. Heltzel,* 201 Or 1, 32 et seq., 268 P2d 605 (1954); *Van Ripper v. Oregon Liquor Control Commission,* 228 Or 581, 365 P2d 109 (1961).

■ For a final assignment of error the tax commission alleges that the trial court erred in not holding the statutory definition inapplicable since ORS 317.010 contains a provision that the definitions set forth in the section shall apply "unless the context requires otherwise." It is the commission's contention that the context requires the statutory definition to be discarded. The argument is that RS 5219 is a necessary part of the "context" of ORS chapter 317,

and that the purpose of the excise act would be frustrated if the statutory definition were used in ORS 317.060.

ORS chapter 317 of the statutes contains 65 sections and covers 29 closely printed pages of the code. Apart from the definition contained in ORS 317.010 (10), the word "financial corporation" appears in only three sections of the chapter: twice in other definitions in ORS 317.010—ORS 317.010 (9) defining "excise tax" and ORS 317.010 (16) defining "taxpayer"—and again in the section in controversy here, ORS 317.060. Thus, if the commission is correct, the definition serves no purpose.

We do not believe, however, that the words "unless the context requires otherwise" are subject to the interpretation thus placed upon them. The reservation means only that the statutory definition of a term is not to be used where the legislature did not intend it to be used at the time the act was drafted. Where a deliberate choice of words has been made with intent that the statutory definition should apply, as obviously was the case in ORS 317.060, then the court must give effect to the definition. See *Nilsen v. Davidson Industries*, 226 Or 164, 360 P2d 307 (1961).

We conclude that the plaintiff was not a "financial corporation" within the meaning of ORS 317.060. It is worth noting that the Corporation Excise Tax Law is not a timid document in which the legislature took the most conservative means possible to insure compliance with federal law regulating the taxation of national banks. By adopting a split-rate tax structure in possible violation of RS 5219, and by adopting a definition of "financial corporation" where none exists in the federal statute, the legislature showed

itself willing to take chances. Most probably it meant to reserve for itself the determination of what corporations are to be regarded for taxation purposes as "financial corporations."

The judgment of the circuit court is affirmed.

SLOAN, J., dissenting.

It is my view that the purchase of contracts is a form of lending money. The banks and plaintiff are engaged in the use of the same commodity for the same purpose: using money to gain interest. The stipulations of the parties that the plaintiff and national and state banks are in direct competition in purchasing contracts is a significant recognition that purchasing contracts, rather than loaning money on them, is purely a different means of doing the same thing. The mere fact that plaintiff's business is couched in the term of "purchasing contracts" does not change the true character of what it is doing. In plain, simple fact it is loaning money. The majority's interpretation is narrow and does not meet the reality of today's banking and financial transactions. The distinctions made are of form and not of substance. I would follow the case of *Crown Finance Corp. v. McColgan*, 1943, 23 Cal2d 280, 144 P2d 331.

Moreover, the interpretation given the Oregon statute by the majority virtually compels a determination that the statute violates the Federal permissive act. We should not accord to the legislature such a purpose nor should we apply such a construction when the opposite is clearly within the meaning of the language used. The judgment should be reversed.

WARNER and O'CONNELL, J. J., join in this dissent.