[No. 21949-21953.  *En Banc.*  August 9, 1929.]

NATIONAL BANK OF COMMERCE OF SEATTLE, DEXTER
HORTON NATIONAL BANK OF SEATTLE, FIRST
NATIONAL BANK OF SEATTLE, NATIONAL CITY
BANK OF SEATTLE, SEATTLE NATIONAL
BANK, *Respondents*, v. KING
COUNTY, *Appellant.*[1]

[1] Reported in 280 Pac. 16.

*Ewing D. Colvin, Harry A. Rhodes,* and *A. O. Colburn,* for appellant.

*Peters, Powell, Evans & McLaren, Poe, Falknor, Falknor & Emory,* for respondent Dexter Horton National Bank.

*Kerr, McCord & Ivey,* for respondent National Bank of Commerce.

*McMicken, Ramsey & Rupp,* for respondent First National Bank of Seattle.

*Bausman, Oldham & Eggerman,* for respondent Seattle National Bank.

*Almon Ray Smith,* for respondent National City Bank.

*Harold Preston* and *Tanner & Garvin, amici curiae.*

MILLARD, J.—On the ground that the assessment was prohibited by § 5219, U.S. Rev. Stat., as discriminative, five national banks of Seattle instituted separate actions against King county to recover taxes paid under protest. Refund of taxes paid for 1926 is sought by the National City Bank and the National Bank of

Commerce. The other plaintiffs seek recovery for taxes paid for 1925 and 1926. The causes were consolidated for purposes of trial below and appeal to this court. Except as to the capital, surplus and undivided profits and the amount of taxes paid by each plaintiff, the facts in the five cases are the same. The causes were tried to the court without a jury, and resulted in separate findings in each action in favor of the plaintiff. From the judgments entered in favor of the plaintiffs, the defendant has appealed.

Respondent national banks, under authority of acts of congress, were actively engaged in the banking business during 1925 and 1926 in the city of Seattle. Their capital, surplus and undivided profits were employed in investments in interest-bearing mortgages, notes, accounts, bonds, warrants and other evidences of debt, and amounted to approximately eleven and one-fourth million dollars on March 1, 1925, and twelve million dollars on March 1, 1926. During 1925 and 1926, savings and loan associations, mutual savings banks, bond houses and other financial institutions engaged substantial sums of untaxed moneyed capital in Seattle and throughout the state in competition with the business of respondents.

The capital of domestic savings and loan associations in Seattle, consisting of the savings or deposits of their members, exceeded twenty-two million dollars on March 1, 1925, and thirty million dollars on March 1, 1926. The capital and funds of the associations were invested in loans upon real estate, interest-bearing bonds and other securities, and loans upon collateral security other than real estate. Not more than fifty per cent of the investments were in loans upon real estate mortgages to home owners. Loans of substantial amounts were made to non-members of the

associations, who became members in form only by depositing a small sum to qualify as a member of the association and to obtain a loan. In one instance, a loan of one-half million dollars was thus made to a fraternal organization for the construction of a lodge home and business building. Approximately ninety per cent of the capital of the associations was contributed by persons who never borrowed from the associations.

On March 1 of each of the years 1925 and 1926, the associations had outstanding from individual citizens of Seattle collateral loans of more than three hundred thousand dollars. This collateral consists of a class of securities accepted by respondent banks as collateral for loans. These loans, during each of the years 1925 and 1926, were in excess of one and one-half million dollars. The associations invested in government, state, municipal and other bonds and warrants of the same character in which the respondents invest, and sold such bonds to citizens of Seattle. Their investments in such bonds and warrants during 1925 and 1926, respectively, exceeded one and three-fourths million dollars and three and three-fourths million dollars. On March 1, 1925, the associations had invested in such bonds and warrants approximately one and one-half million dollars; and on March 1, 1926, two and one-half million dollars.

In purchasing municipal bonds and warrants, the associations would bid therefor in competition with respondent banks and other financial organizations; and upon such competition purchased, during 1925 and 1926, entire series of county and municipal bonds and warrants. The associations accepted deposits, and it was a common practice to permit withdrawal of deposits at will and without notice upon a form of deposit and withdrawal slips similar to that used by the

respondents. A rate of interest higher than that paid by respondents was paid by the associations on savings deposits.

On March 1, 1925, the guaranty fund, surplus and undivided profits of domestic mutual savings banks in Seattle were approximately six hundred and seventy-five thousand dollars; and on March 1, 1926, exceeded eight hundred thousand dollars. Their deposits on March 1, 1925, were approximately thirty-three million dollars; and on March 1, 1926, more than forty million dollars. Of their total resources, exceeding thirty-three million dollars on March 1, 1925, more than twenty-two million dollars were invested in first mortgages on improved real estate; forty-two thousand dollars in collateral loans to citizens of King county, and ten and one-half million dollars in government, state, municipal and other bonds and warrants. On March 1, 1926, of their total resources of forty-one million dollars, twenty-seven millions were invested in first mortgages on improved real estate; sixty-one thousand in collateral loans to King county citizens, and twelve and one-half millions in bonds and warrants.

Only one trust company was actively engaged in business in Seattle. Its capital, surplus and undivided profits on March 1, 1925, were $697,365; and on March 1, 1926, $879,496. It acts in all fiduciary capacities, as national banks are permitted to do under acts of congress and laws of this state. The company conducted a mortgage loan business by negotiating mortgages with the borrowers, sold bonds or participating certificates issued under mortgages or trust deeds to individual investors, most of whom were citizens of Seattle. During 1925 and 1926, it made collateral loans of approximately fifteen to twenty thousand dollars; and its loans on mortgages against leaseholds

approximated, in 1925, five hundred thousand dollars, and in 1926, seven hundred thousand dollars. These loans were in the form of bond issues, and most of the bonds were sold to King county citizens. Real estate loans, exclusive of loans against leaseholds, were made by the trust company, approximating three million dollars during 1925; and two and three-fourths million dollars during 1926. The bonds and participating certificates issued against the mortgages were sold to the public, and particularly to citizens of King county. The company acted as trustee for bond issues secured by mortgages upon real estate and leaseholds aggregating seven million dollars during 1925, and more than seven million dollars in 1926. As trustee and executor, the trust company managed estates having investments in mortgages, notes and bonds of approximately two and one-fourth million dollars in 1925, and thirteen and one-half million dollars in 1926.

The activities of domestic and foreign finance corporations maintaining offices in Seattle and doing business in 1925 and 1926 throughout King county, chiefly consisted in the financing of automobile dealers, merchants and individual citizens of the state by lending money upon security of interest-bearing chattel mortgages or conditional sale contracts upon automobiles, furniture and chattels of various kinds, and also upon assigned accounts and bills receivable, or by the purchase of such mortgages or conditional sale contracts at a discount sufficient to yield a large interest return.

Nearly all of the mortgages or purchases were guaranteed by the borrower or vendor. The course pursued by the companies is substantially the same as that followed by the respondent banks in financing such transactions. In many instances, customers of the companies were patrons of the national banks and often financed themselves through the national banks

and the finance corporations at the same time. Before the entry of the finance companies into the field, such financing was done almost exclusively by the national banks. The finance companies have deprived the national banks of a large percentage of this business by making advances exceeding the amount advanced theretofore by the national banks upon similar securities.

The combined capital, surplus and undivided profits of the domestic finance companies in Seattle on March 1, 1925, were more than one and three-fourths million dollars, and on March 1, 1926, not less than two and one-half million dollars. The amount invested in loans and purchases and which the companies owned and had on hand March 1, 1925, was approximately three and one-half million dollars, and on March 1, 1926, four and one-half million dollars. The volume of such investments during 1925 was not less than seven million dollars, and almost nine and one-half million dollars during 1926.

The foreign finance corporations did a business of approximately two and one-fourth million dollars in 1926, and owned on March 1, 1926, one and one-fourth million dollars of investments.

Industrial loan companies, domestic corporations maintaining offices in Seattle, had on March 1, 1925, capital, surplus and undivided profits of two hundred and seventy-one thousand dollars; and on March 1, 1926, approximately three hundred and sixty-four thousand dollars. They owned on March 1, 1925, interest-bearing mortgages and discounts approximating three hundred thousand dollars, and on March 1, 1926, five hundred thousand dollars. The activities of the companies were very similar to those of the finance companies. Their loans and discounts were made by way of salary loans, assignments of bills receivable and

upon the security of chattel mortgages and conditional sale contracts upon automobiles and other chattels, and also by the purchase of chattel mortgages and conditional sale contracts and real estate contracts at a discount that would yield a large interest return.

Domestic bond dealers and investment bankers doing business in Seattle engaged in the purchase of government, state, county and municipal bonds and warrants and bonds of public utilities and other corporations, and sold the same to citizens of this state. These companies participated in the origination and underwriting of such issues, and entered into competitive bidding with the banks, not only entering into the purchase of county, municipal and other bonds and warrants, but selling some in which they dealt with individual citizens of this state and with the investing public in competition with the national banks. The combined capital, surplus and undivided profits of such companies on March 1, 1925, approximated one and one-half million dollars, and on March 1, 1926, more than two million dollars. These companies owned on March 1, 1925, bonds and warrants valued at more than two and one-half million dollars, and on March 1, 1926, in excess of three and one-half million dollars. During 1925 such companies sold bonds in excess of fifty-three million dollars, and during 1926 such sales amounted to nearly sixty-eight million dollars. These sales, in the main, were made to citizens of this state. The business transacted by these bond dealers was of the same general character as the bond business done by the national banks, in that both were actively engaged in the investment business and bought the same class of securities for resale to the investing public.

Foreign investment bankers or bond dealers, who conducted their business in Seattle in the same manner as the domestic investment bankers and the national

banks, sold bonds through their Seattle offices to individual citizens of this state in approximately the sum of twenty-six million dollars during 1925, and thirty-one million dollars during 1926. The record does not definitely disclose the amount of capital employed by such concerns in the conduct of their business; however, in view of the volume of sales, there is no escape from the conclusion that a substantial amount of capital was in use in the operation of their business within this state.

The investment companies, of which complaint is made, were domestic corporations engaged in business in Seattle. Their business consisted of the investment of their capital, surplus and undivided profits in high class bonds—industrial, railroad, public service, municipal and foreign government bonds. These bonds are of the character extensively dealt in by the national banks. The companies changed their investments and took advantage of the increase of price by selling the bonds, from time to time, and reinvesting the proceeds in other interest-bearing securities. These companies did not act as agents or brokers for any other person, but they did employ their capital in the same sort of transactions as those in which national banks engaged. The combined capital, surplus and undivided profits of these companies on March 1, 1925, were in excess of twenty-two million dollars, and on March 1, 1926, more than twenty-three million dollars. They owned on March 1 of each of the years 1925 and 1926 interest-bearing securities aggregating seven million dollars.

Commercial note brokers were all foreign corporations maintaining local offices in Seattle. We can not find in the statement of facts evidence as to the total amount of capital employed by these companies in their business during 1925 and 1926. During 1925,

they sold commercial paper to citizens of Seattle of the approximate value of seven and one-half million dollars, and in 1926, three million dollars. These corporations purchased commercial paper in this state of the approximate value of one and one-half million dollars during 1925, and in 1926 about the same amount. The commercial paper purchased was issued by borrowing customers of the national banks. From the amount of purchases and sales made by these companies, the trial court was warranted in finding that the companies employed a substantial amount of capital in the conduct and operation of the local business.

Mortgage loan companies, domestic corporations doing business in Seattle, engaged in soliciting loans and lending money upon mortgages upon improved real estate. In many instances, they issued and sold bonds secured by such mortgages. The capital, surplus and undivided profits of such companies, on March 1, 1925, were $1,800,000, and on March 1, 1926, $1,950,000. On March 1, 1925, these companies owned investments in such mortgages of approximately five and one-half million dollars, and on March 1, 1926, six and one-half million dollars. The volume of mortgage loans made by these companies during 1925 was approximately fourteen and three-fourths million dollars, and during 1926 fifteen and one-half million dollars.

Domestic insurance companies maintaining their principal offices in Seattle had, on March 1, 1925, capital, surplus and resources of more than four million dollars, and on March 1, 1926, in excess of five million dollars. These companies, on March 1, 1925, owned real estate mortgages of the value of one and one-half million dollars, and on March 1, 1926, in excess of two million dollars. All of the mortgages were secured by improved real estate, most of which was situated in Seattle. On March 1, 1925, the companies owned bonds

of the approximate value of four million dollars, and on March 1, 1926, five and one-fourth million dollars.

For the years 1925 and 1926, no tax was assessed against the moneyed capital employed by any corporation, association or company in competition with the moneyed capital of respondent banks. On March 1, of each of the years 1925 and 1926, from one-half of the sum of the capital, surplus and undivided profits of the respondent banks, was deducted the assessed value of the real estate owned by the respondents. The remainder thus obtained was taxed as the value of the shares of stock of the respondent banks. Under this plan of taxation, the capital, surplus and undivided profits of respondents amounting to $12,081,000 on March 1, 1926, were assessed $261,949.11. The real estate owned by the competitors herein of the respondents was assessed at the same rate as the real estate owned by the respondents, but no assessments were levied against the competitors' personal property or intangible assets, except their office furniture and fixtures.

The total taxes paid by the building and loan associations for 1926 amounted to $1,158.42, by the mutual savings banks, $630.91, by the trust company, $1,300.68, by domestic bond companies, $600, and by domestic mortgage loan corporations, $1,950. We are unable to determine from the record the total amount of taxes paid by the finance corporations, industrial loan companies and the domestic investment companies; however, our examination elicits the fact that the taxes were restricted to the office furniture and equipment.

The trial court concluded that the taxing of the shares of stock of the respondent banks and the exempting of the shares of the other companies, corporations and associations and other moneyed capital coming into competition with the business of the national

banks, contravened § 5219, U. S. Rev. Stat., and that the tax levied upon the shares of stock of the respondent banks was void. Judgments were entered accordingly.

Congress, mindful that a uniform rule of taxation as nearly as possible should be adopted, by § 5219, *supra,* enacted a rule that the states cannot tax the shares of national banks at a higher rate than the states tax other moneyed capital, if competitive, in the hands of the citizens of the states. That section is as follows:

"The legislature of each state may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several states may tax said shares, or include dividends derived therefrom in the taxable income of an owner or holder thereof, or tax the income of such associations, provided the following conditions are complied with: . . .

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state coming into competition with the business of national banks; Provided, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section . . ." U. S. Code, Title 12, § 548 (Rev. Stat., § 5219, March 4, 1923, c. 267, 42 Stat., 1499).

■ The question presented for determination is whether moneyed capital in this state is employed in substantial competition with national banks and taxed at a lower rate than the shares of stock of the respondent banks.

" 'National banks are not merely private moneyed institutions, but agencies of the United States, created under its laws, to promote its fiscal policies; and hence the banks, their property, and their shares cannot be taxed under state authority, except as congress consents and then only in conformity with the restrictions attached to its consent.' *First National Bank v. Anderson,* 269 U. S. 341, 46 S. Ct. 138; *Des Moines Bank v. Fairweather,* 263 U. S. 103, 106, 44 S. Ct. 23, 68 L. Ed. 191. Congress, by appropriate legislation, has permitted the taxation of shares in national banks subject to certain restrictions. Section 5219 sanctions such taxation in the state where the bank is located, subject to the restriction that 'the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state.' By decisions of this court construing this language, it is established that the phrase 'other moneyed capital' does not embrace all moneyed capital not invested in bank shares, but only that which is employed in such way as to bring it into substantial competition with the business of national banks.' *First National Bank v. Anderson, supra, First National Bank v. Hartford,* 273 U. S. 548, 47 S. Ct. 462.

*Moneyed capital includes:*

". . . *not only moneys invested in private banking,* properly so called, *but investments* of individuals *in securities that represent money* at interest *and other evidences of indebtedness such as normally enter into the business of banking."* *Merchants' Nat. Bank v. Richmond,* 256 U. S. 635, 65 L. Ed. 1135 (Italics ours).

▮▮ Accepting the term "moneyed capital" as employed in § 5219, *supra,* as meaning competitive capital, what business is competitive with the business of national banks? This, of course, is a mixed question of law and fact. To definitely answer that question, we must ascertain the manner in which the capital is employed. Having determined from the evidence how national banks employ their capital, we also find from the evidence the kind of business the competitors are

transacting. The evidence and the law decide the issue.

"Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of § 5219, even though the competition be with some but not all phases of the business of national banks. *Section 5219 is not directed merely at discriminatory taxation which favors a competing bank business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command.*

"Our conclusion is that *section 5219 is violated wherever capital, substantial in amount when compared with the capitalization of national banks is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage* and in the same locality in which they do business." *First Nat. Bank v. Hartford,* 273 U. S. 548, 71 L. Ed. 767 (Italics ours).

In stating the reason for the enactment of § 5219, *supra,* and describing the terms "other moneyed capital" and "competition," the supreme court of the United States said:

"The purpose of the restriction is to render it impossible for any state, in taxing the shares to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking.

"*The term 'other moneyed capital' in the restriction is* not *intended to include all moneyed capital* not invested in national bank shares, but only that which is *employed in such way as to bring it into substantial competition with the business of national banks.*"

"*Moneyed capital is brought into such competition* where it is invested in shares of state banks or in private banking; and also *where it is employed, sub-*

*stantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment."* First Nat. Bank v. Anderson, 269 U. S. 341, 70 L. Ed. 295 (Italics ours).

*"The supreme court of appeals entertained the view that the purpose of § 5219, Rev. Stats., was confined to the prevention of discrimination by the states in favor of state banking associations as against national banking associations and that since none such is shown here there was no repugnance to the Federal statute. This, however, is too narrow a view of § 5219.* It traces its origin to § 41 of the act of June 3, 1864, c. 106, 13 Stat. 99, 111-112, in which, besides the restriction that state taxation of the shares of national banking associations should not be at a greater rate than that assessed upon other moneyed capital in the hands of individual citizens of such state, there was an express proviso that the tax should not exceed the rate imposed upon the shares of state banks. But this was modified by act of February 10, 1868, c. 7, 15 Stat. 34, in a manner which, as was pointed out in *Boyer v. Boyer*, 113 U. S. 689, 691-692, precluded the possibility of an interpretation permitting the states, while imposing the same taxation upon national bank shares as upon shares in state banks, to discriminate against national bank shares in favor of moneyed capital not invested in state bank stock. 'At any rate,' said the court, 'the acts of congress do not now permit any such discrimination.' In the amended form the provision was carried into the Revised Statutes as § 5219, which prescribes that state taxation of shares in the national banks 'shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state.' " *Merchants Nat. Bank v. Richmond*, 256 U. S. 635. (Italics ours.)

From the foregoing, it is clear that, if it appear from the evidence that the business in which the competitors are engaged is the same kind and character as the business transacted by the national banks in any of

their departments, then the competitive character has been determined.

■ The business of respondent banks consists of loans on, and investments in, mortgages, notes, accounts, bonds and warrants; the discounting and negotiating of promissory notes, drafts, bills of exchange and other evidences of debt; the purchasing at discount of conditional sale contracts and chattel mortgages upon automobiles and other chattels; the receipt of savings, time and commercial deposits; the buying and selling of exchange; the lending of money on personal security and on collateral security; the operation of safe deposit vaults; the conduct of general trust departments; and the operation of bond departments for the purchase and sale of interest-bearing securities.

The evidence amply sustains the finding of the trial court that substantial moneyed capital was employed in competition with the business carried on by the respondent banks.

From the facts above stated, appellant's position, that no harmful competition has been shown and the business of the national banks as conducted is not within the scope of § 5219, is manifestly not tenable. The fact of substantial competition in the lines of business in which respondents were actually engaged, is established. It is not contended that the capital employed by the above enumerated competitors is not substantial, as compared with the capital employed by the respondent banks. The respondent banks, authorized so to do, were actually engaged in making the same class of investments and transacting the same kind of business as their competitors.

"The first question of importance which suggests itself in construing the reference of the statute to the 'business' of national banks is the one whether the

statute means the business which national banks are authorized to transact or the business which it may appear in any given case of alleged competition a particular bank or group of banks is actually transacting, whether the basis of this test is potential business or actual transactions. We think that the former interpretation is to be placed upon the statute, and that it was the intent of congress and of the legislature that this test of taxation should be the one whether moneyed capital was engaged in competition with the business which national banks are authorized to carry on rather than the one whether it was being used in operations which brought it into direct competition with actual transactions then and there being carried on by a national bank." *People v. Goldfogle,* 242 N. Y. 277, 151 N. E. 452, 460.

The same class of investments in which the competing capital was employed was open to the respondent banks, and

"It is enough as stated if both engage in seeking and securing in the same locality capital investments of the class now under consideration which are substantial in amount." *First Nat. Bank v. Hartford,* 273 U. S. 548, 47 S. Ct. 462.

*First Nat. Bank v. Hartford, supra,* is exceptionally apposite. The Wisconsin statutes imposed an *ad valorem* tax upon the shares of all banks as personal property, and exempted from such taxation:

". . . all moneys or debts due or to become due to any person and all stocks and bonds, including bonds issued by any county, town, city, village, school district, or other political subdivision of this state, not otherwise specifically provided for."

The bank brought an action to recover the taxes paid. In that case, as in the cases at bar, no tax was levied upon credits or intangible property other than the shares of stock in banking corporations. The lower court decided in favor of the bank, but the supreme

court of the state reversed the judgment, and a writ of error was sued out by the supreme court of the United States, which reversed the judgment.

"The evidence shows that plaintiff in the course of its business receives deposits, loans money, has a savings department, deals in exchange, buys and sells notes, government and other bonds, discounts commercial paper and acquires real estate mortgages by loan and purchase.

"There are real estate firms engaged in lending money to individuals in the vicinity of plaintiff's banking house, the amount thus loaned amounting annually from $250,000 to $300,000. According to the testimony, the making of these loans affords the same competition to plaintiff as loans made by banks. And similar conditions obtain throughout the state. There are various individuals, co-partnerships and corporations in the vicinity engaged in the business of acquiring and selling notes, bonds, mortgages and securities. Substantial capital is employed in their business. Others, having their place of business in Milwaukee and in Chicago, are engaged within the state in the business of buying and selling securities both in the vicinity of plaintiff's banking house and elsewhere, and employ capital for that purpose. Securities thus acquired and offered for sale include public utility and other forms of bonds, notes and farm mortgages. In 1921, one company alone, having its place of business in Milwaukee but doing business throughout the state, including the vicinity of plaintiff's bank, sold approximately $25,000,-000 of bonds and other securities. Neither the capital employed in these various enterprises by individuals or corporations, so far as invested in the credits, nor the shares held by investors in such corporations is subjected to the *ad valorem* tax . . .

"It affirmatively appears from the evidence, that there are individuals, firms and corporations in Wisconsin, not required by its laws to be incorporated as banks, engaged in the business of loaning money on the security of notes, bonds, and mortgages, and buying and selling securities, all involving investment and re-

investment by them and their customers. Through the activities of these business concerns, large investments are made and remade in such securities. Large amounts of capital are thus employed in some of the ordinary banking activities, although these individuals and firms do not receive deposits.

"The state court did not ignore this evidence. . . it apparently construed the decisions of this court as requiring equality in taxation only of moneyed capital invested in businesses substantially identical with the business carried on by national banks. Consequently, since that class of business must under the Wisconsin statutes be carried on in corporate form, and capital invested in it is taxed at the same rate as national bank shares, other moneyed capital, as defined in § 5219, within the state, it thought, was not favored. Under this view, if logically pursued, capital invested in businesses engaged in some, but not all of the activities of national banks as well as that employed by individuals in investment and reinvestment in securities, such as we have described, could not be considered in determining the question of competition.

"But this court has recently had occasion, in reviewing the earlier decisions dealing with this subject, to point out that the requirement of approximate equality in taxation is not limited to investment of moneyed capital in shares of state banks or to competing capital employed in private banking.

"Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of § 5219, even though the competition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command. No decision of this court appears to have so qualified § 5219 as to permit discrimination in taxation in favor of moneyed capital such as is here contended for. To so restrict the meaning and appli-

cation of § 5219 would defeat its purposes. It was intended to prevent the fostering of unequal competition with the business of national banks by the aid of discriminatory taxation in favor of capital invested by institutions or individuals engaged either in similar businesses or in particular operations or investments like those of national banks. *Mercantile Bank v. New York,* 121 U. S. 138. With the great increase in investments by individuals and the growth of concerns engaged in particular phases of banking shown by the evidence in this case and in *Minnesota v. First Nat. Bank of St. Paul,* 273 U. S. 561, today decided, discrimination with respect to capital thus used could readily be carried to a point where the business of national banks would be seriously curtailed. Our conclusion is that *§ 5219 is violated wherever capital, substantial in amount when compared with the capitalization of national banks, is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage and in the same locality in which they do business."* *First Nat. Bank v. Hartford,* 273 U. S. 548, 47 S. Ct. 462. (Italics ours.)

The following cases are to the same effect: *Merchants' Nat. Bank v. Richmond,* 256 U. S. 635, 65 L. Ed. 1135; *First Nat. Bank v. Anderson,* 269 U. S. 341, 70 L. Ed. 295; *Minnesota v. First Nat. Bank,* 273 U. S. 561, 71 L. Ed. 774; *Brotherhood Co-op. Nat. Bank. v. Hurlburt,* 26 Fed. (2d) 957; *Commercial Nat. Bank v. Custer County,* 275 U. S. 502, 72 L. Ed. 395.

Simple investments of individuals are not "moneyed capital" unless made by the individual either in his banking or investment business. The test is the manner in which a man employs his money in business. When it is established that the business claimed to be competitive is being carried on and the money is being employed in the same manner that the national banks are employing their money in any one of their capaci-

ties, then the competitive nature of the business is established under § 5219, Rev. Stat.

■ There has been quite a revisal of the business of finance within the past twenty years. Investment companies, bond houses and loan companies, as they are now conducted, are of comparatively recent origin. Bond houses sell bonds of the same kind that national banks buy and sell. Finance companies lend money on assigned accounts, which is a business in which national banks engage. The finance companies lend money on automobile paper, a large business in which the national banks engage; and there is evidence that the national banks' entry therein antedated by a number of years the invasion of the field by the finance companies. The activities of the trust company were in competition with the business of the respondent banks. This branch of banking was expressly authorized by congress. The supreme court of the United States, in *First Nat. Bank v. Fellows*, 244 U. S. 416, 61 L. Ed. 1233, said:

"From this it must also follow that even although a business be of such a character that it is not inherently considered susceptible of being included by congress in the powers conferred on national banks, that rule would cease to apply if, by state law, state banking corporations, trust companies, or others which, by reason of their business, are rivals or *quasi*-rivals of national banks, are permitted to carry on such business. This must be, since the state may not by legislation create a condition as to a particular business which would bring about actual or potential competition with the business of national banks, and at the same time deny the power of congress to meet such created condition by legislation appropriate to avoid the injury which otherwise would be suffered by the national agency."

The mutual savings banks take deposits and invest them in bonds and securities of the character in which

the national banks invest. The investments are made for the same purpose that the national banks invest their capital—for the earnings. It is not the name that gives the right of exemption. It is what they do. The investments of the savings and loan associations in collateral loans of more than one and one-half million dollars, on a class of securities accepted by respondents as collateral for loans, clearly establish the fact of substantial moneyed capital in competition with the national banks.

In the case of *Commercial Nat. Bank v. Custer County,* 76 Mont. 45, 245 Pac. 259, the supreme court of Montana held that moneys invested in the shares of savings and loan associations are not competitive capital within the meaning of § 5219, Rev. Stat. Some of the moneys contributed to the association by members were contributed by members who did not borrow from the association. The supreme court of the United States, by memorandum opinion, *Commercial Nat. Bank v. Custer County,* 275 U. S. 502, 72 L. Ed. 221, reversed the judgment of the supreme court of Montana on the authority of *First Nat. Bank v. Hartford,* 273 U. S. 548.

*Georgetown Nat. Bank v. McFarland,* 273 U. S. 568, relied upon by appellant, holds that the bank failed to prove that the favored capital complained of was in fact substantially competitive.

"The court of appeals of Kentucky, following the state practice, reviewed the evidence, concluding from it that 'no material part of the capital held by the individuals is so invested as to come in competition with the national banks.'

"The evidence is set forth in the record. In some particulars it is conflicting and the conflicts are such that their resolution by the court of appeals should be accepted by us. It cannot be said either that the

finding is without evidence to support it or that it certainly is against the weight of the evidence."

That case rests largely upon the presumption of correctness which the supreme court of the United States accorded to the findings of the highest court of Kentucky, inasmuch as the supreme court of the United States could not say that the evidence clearly preponderated against the finding that there was no substantial competition.

The contention of appellant that the statutory and administrative policy of the state does not evince intentional discrimination was also advanced in *First Nat. Bank v. Hartford, supra.* The supreme court of the United States said:

"Finally, it is said that § 5219 is directed to an unfriendly discrimination or hostile attitude on the part of a state, and that here the Wisconsin legislation was not dictated by such considerations, since the challenged exemptions were merely incidental to the adoption of a state policy of substituting, so far as possible an income for a personal property tax. But a consideration of the entire course of judicial decision on this subject can leave no doubt that *state legislation and taxing measures which by their necessary operation and effect discriminate against capital invested in national bank shares in the manner described are intended to be forbidden.*" (Italics ours.)

The evidence in the cases at bar clearly preponderates in support of the finding of the trial court that moneyed capital in the hands of individual citizens of this state is employed in substantial competition with national banks and taxed at a lower rate than the shares of stock of the respondent banks. The supreme court of the United States has in recent years repeatedly held that business of the kind shown by the evidence in these cases constituted competition of the

character congress contemplated as discriminative against national banks under § 5219, U. S. Rev. Stat.

We have examined all of the authorities cited. To review them, would unnecessarily extend this opinion. They are either in harmony with the views herein expressed, or are distinguishable on the facts.

The judgments are affirmed.

MAIN, BEALS, PARKER, TOLMAN, FRENCH, and FULLERTON, JJ., concur.

MITCHELL, C. J., was unable to participate in this case.

HOLCOMB, J. (concurring)—I concur in the result reached in the foregoing decision although I disagree with the language as follows:

"When it is established that the business claimed to be competitive is being carried on and the money is being employed in the same manner that the national banks are employing their money in any one of their capacities then the competitive nature of the business is established under § 5219, R. S."

There is no escape from the recent decisions of the supreme court of the United States, *First National Bank v. Hartford,* 273 U. S. 548, 71 L. Ed. 767; and *Minnesota v. First Nat. Bank,* 273 U. S. 561, 71 L. Ed. 774, involving the effect of U. S. Rev. Stat. § 5219 in such cases as those here from King county. The evidence not only does not preponderate against the findings of the lower court, but in their support. But the supreme court in the cited cases did not hold as is stated in the majority opinion. It held in them, and in all other cases that I have been able to review, that (1) the competing capital complained of must be employed in the same locality in which the competing banks do their business; and (2) the competing capital must be *substantial in amount* when compared with the *capitali-*

*zation of the national banks.* Those principles were iterated and reiterated in both the cited cases and are to be considered as decisive and established principles.

In a county having such a great commercial center as Seattle, with its vast financial institutions and financial activities, with the privileged activities now conferred upon national banks by Federal statutes, there can be no question but that nearly all the capital referred to in the majority opinion is "competing moneyed capital."

These cases, therefore, fall within the rules stated in the Wisconsin and Minnesota cases cited, *supra.*