[Civ. No. 22880. First Dist., Div. Two. Mar. 22, 1966.]

MARBLE MORTGAGE COMPANY, Plaintiff and Respondent, v. FRANCHISE TAX BOARD, Defendant and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General and Neal J. Gobar, Deputy Attorney General, for Defendant and Appellant.

Landels, Ripley, Gregory & Diamond and Edward D. Landels for Plaintiff and Respondent.

TAYLOR, J. — Respondent, Marble Mortgage Company (hereafter referred to as Marble), was successful in the trial court in this action for a refund of a portion of the California franchise tax paid under protest for its fiscal years ending September 30, 1956, September 30, 1957, and September 30, 1958. On this appeal by the State Franchise Tax Board (hereafter referred to as the state), the sole question is one of law, i.e., whether Marble was a "financial corporation" within the meaning of that term as used in section 23183 of the Revenue and Taxation Code, and therefore taxable at the rate imposed on banks, as the state contends, or whether Marble was a general corporation taxable at the rate imposed pursuant to section 23151 of the Revenue and Taxation Code. The propriety of taxing Marble at the bank rate turns on the question of whether the activities of Marble were in substantial

competition with national banks (*Crown Finance Corp.* v. *McColgan,* 23 Cal.2d 280 [144 P.2d 331] ; *Morris Plan Co.* v. *Johnson,* 37 Cal.App.2d 621 [100 P.2d 493]).

The matter was tried on the following uncontroverted facts : During the period of time here involved, Marble was engaged in the business of initiating loans secured by first trust deeds on real property in southern California with the intention of assigning them to various institutional investors, a business commonly referred to as ''mortgage bankers'' or ''loan correspondents.'' The loans made by Marble were primarily on single family homes of the same nature as real estate loans made by banks, although a few loans were made on multiple dwellings or commercial buildings. Marble's terms were somewhat more liberal than those of banks on conventional (nonfederally insured) loans.

Marble solicited loans from builders, realtors and the public. On receiving loan requests, Marble advised the borrowers of its lending terms, based on its knowledge of the requirement of its institutional investors and general market conditions. Marble set its own charges or ''points'' for initiating and servicing loans. Marble usually obtained a commitment before making the loan. At other times, Marble proceeded to make the loan, knowing it was of the type that one or more of its institutional investors or ''purchasers'' would buy. Marble established lines of credit with banks and generally financed its lending by borrowing from banks or by use of its own funds. On construction loans, Marble normally held the loan until construction was completed and the homes sold. Where the development of a large tract was involved, Marble often obtained a letter of intent from the institutional investor, indicating the investor's intent to purchase on completion. Marble would then finance the construction of the development and, as with other construction loans, the loan was not assigned to the purchaser until after the houses had been completed and sold.

Marble received and retained the income accruing during the period in which it held the loans prior to assignment. During the period of time here involved, between 51 and 60 percent of Marble's gross income was obtained from this source and amounted to approximately $290,000 in 1955, $272,000 in 1956, and $435,000 in 1957.

After assignment of the loans, Marble collected the principal and interest due and protected the interests of the ''purchaser'' by seeing to it that taxes and insurance were paid,

and the property properly maintained until the loan was paid off, etc. The portion of the interest retained by Marble after assignment of the trust deeds, constituted between 34 and 42 percent of its gross income during the three years here in question. Marble's rights and responsibilities were set forth in the contractual agreements with the institutions to whom Marble assigned deeds of trust.[1] Under these agreements, Marble retained as its so-called "servicing fee" a portion of the interest payments on the loans (normally $\frac{1}{2}$ percent) that had been assigned, as well as any late charges collected from the mortgagor. The "purchaser" could not terminate Marble's rights except by specified payments and had the right to return the trust deeds to Marble for periods of time ranging up to six months and for a variety of reasons. The contractual agreements indicated that Marble was acting as an independent contractor rather than an agent of the "purchaser."

In 1957, Marble entered into arrangements with pension funds desirous of purchasing a given dollar value of federally insured loans (F.H.A. and/or V.A.). Marble made these federally insured loans without any prior commitment or letters of intent. If the F.H.A. and V.A. loans made by Marble did not meet the requirements of Marble's "purchasers," Marble sometimes sold these loans without commitment to the Federal National Mortgage Association. During a nine-month period in 1957, Marble assigned 33 deeds of trust to F.N.M.A.

The trial court found that Marble was engaged in the business of originating and servicing real estate loans for various institutional investors and that the principal and primary source of its income consisted of fees received for servicing these loans. The court concluded that Marble was not engaged in a business in substantial competition with national banks and therefore was not a "financial corporation" within the meaning of that term as used in section 23183 of the Revenue and Taxation Code.

 The classification "financial corporation" in the Bank and Corporation Franchise Tax Act (Rev. & Tax. Code, § 23183 et seq.) was made for the purpose of complying with the federal statute (12 U.S.C.A. § 548) prohibiting discrimination in taxation between national banks and other financial corporations (*Morris Plan Co.* v. *Johnson,* 37 Cal.App.2d 621,

---

[1] In the tax years here involved, Marble assigned deeds of trust to 10-20 such institutional investors or "purchasers."

624 [100 P.2d 493]). ■ The term "financial corporation" in the Revenue and Taxation Code is interpreted to mean a corporation dealing in "other moneyed capital" as that term is used in paragraph 1(b) of the federal statute (Traynor & Keesling, *Recent Changes in Franchise Tax Act*, 22 Cal.L.Rev., 499, 510-511).

■ National banks are not merely private businesses, but rather are agencies of the United States, created by it to promote its fiscal policies, and financed by private capital. Hence, the national banks and their shares are taxable by the states only with the consent of Congress, and then only in accordance with such restrictions and in the manner Congress has authorized (*First Nat. Bank* v. *Anderson*, 269 U.S. 341 [46 S.Ct. 135, 70 L.Ed. 295]).

The federal statute limiting state taxation, 12 United States Code Annotated section 548 (Rev. Stat. § 5219) provides, so far as pertinent: "The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause.

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided*, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.

"(c) In case of a tax on or according to or measured by the net income of an association, the taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor higher

than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits: *Provided, however,* That a State which imposes a tax on or according to or measured by the net income of, or a franchise or excise tax on, financial, mercantile, manufacturing, and business corporations organized under its own laws or laws of other States and also imposes a tax upon the income of individuals, may include in such individual income dividends from national banking associations located within the State on condition that it also includes dividends from domestic corporations and may likewise include dividends from national banking associations located without the State on condition that it also includes dividends from foreign corporations, but at no higher rate than is imposed on dividends from such other corporations.''

This state has chosen to use the so-called ''fourth method'' of taxation approved by the federal statute, namely, taxing national banks according to, or measured by, their net income. Thus, under the California Bank and Corporation Franchise Tax Act, corporations other than banks and financial corporations are taxed at a flat rate of 4 percent of their net income and are also required to pay other taxes, including real and personal property taxes. Banks and other financial corporations are required to pay as a franchise tax a percentage of net income not to exceed 8 percent made up of two parts: first, a flat rate or 4 percent as paid by nonfinancial corporations, and, second, an additional percentage determined on the basis of the ratio between the other personal property taxes required to be paid by nonfinancial corporations and their total net income attributable to California. The Bank and Corporation Franchise Tax Act provides that the tax so applied to banks and financial institutions is in lieu of all other state, county or municipal taxes or licenses except real property taxes.

Financial corporations are not exempt from personal property taxes and such corporations also pay various excise taxes and license fees. However, while financial corporations are taxed at the same rate as banks, they are permitted to offset against the franchise tax ''the amounts paid during the income year to this State or to any county, city, town or other political subdivisions of the State as personal property taxes, or as license fees or excise taxes'' for certain designated privileges (Rev. & Tax. Code, § 23184). Thus, the amount of additional tax paid by financial corporations is reduced by the

amount of personal property taxes and various licenses and excise taxes they have already paid. The validity of the California system of taxation on national banks has been upheld and is not in issue here (*Security-First Nat. Bank* v. *Franchise Tax Board,* 55 Cal.2d 407 [11 Cal.Rptr. 289, 359 P.2d 625], appeal dismissed 368 U.S. 3 [82 S.Ct. 15, 7 L.Ed.2d 16]).

The term "financial corporation" is not defined by Revenue and Taxation Code section 23001 et seq., and guidance as to the applicable test must be obtained from the decisions of our Supreme Court and the relevant decisions of the U. S. Supreme Court. In *Crown Finance Corp.* v. *McColgan,* 23 Cal.2d 280 [144 P.2d 331], our Supreme Court pointed out that the purpose of the statutory provisions relating to the taxation of financial corporations was to avoid discrimination against national banks. The court said at pages 284-285: "Neither the federal statute nor the state act defines the term 'financial corporations.' However, in the federal act, in the case of a tax on national bank shares as distinguished from a tax measured by or according to the income, it is provided that the tax may not be greater than upon moneyed capital coming into competition with the business of national banks. (12 U.S.C.A. § 548, clause 1(b).) That clause is interpreted to mean that: 'The purpose of the restriction is to render it impossible for any State, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking.' (*First Nat. Bank* v. *Anderson,* 269 U.S. 341, 347 [46 S.Ct. 135, 70 L.Ed. 295].) Inasmuch as the broad purpose of the restriction in the federal statute on state taxation of national banks is to prevent discrimination between national banks and financial corporations (see *Tradesmens* [*Nat.*] *Bank* v. *Tax Comm'n,* 309 U.S. 560 [60 S.Ct. 688, 84 L.Ed. 947]), and there would not likely be any discrimination where the financial corporations were not competing with national banks, we believe that a corporation may not be classed as financial under the state act unless it is in substantial competition with the business of national banks. Moreover, financial corporations being placed in a special class without definition, the other portions of the federal statute (12 U.S.C.A., § 548, clause 1(b)), which refer to activities similar to those customarily associated with corporations engaged in financial business, should control. The

reference in section 548, clause 1(b), is to *'moneyed capital.'* The word 'financial' when used with reference to corporations indicates dealing in money as distinguished from other commodities. (*Morris Plan Co.* v. *Johnson, supra,* p. 624.) The distinguishing feature between 'mercantile, manufacturing, and business' corporations mentioned in section 548 and financial corporations would therefore appear to be the dealing in *moneyed capital.* It is reasonable to assume that discrimination would not be present unless the financial corporation was competing with national banks.'' (Italics added.)

The focus is on competition among financial businesses for investment capital and the danger sought to be averted is that such capital might abandon the national banks for other financial enterprises if the latter were made relatively more profitable by preferential tax treatment (*Mercantile Nat. Bank* v. *New York,* 121 U.S. 138 [7 S.Ct. 826, 30 L.Ed. 895]). Ultimate attention, however, is directed by the federal provision to the question of whether ''other moneyed capital'' employed in competition with the business of national banks receives favored tax treatment, for it is primarily that capital which is attracted to or dissuaded from investment in national banks by the relative profitability of the other financial enterprises available for investment. Thus, for example, savings bank deposits were early held not required by the federal provision to be taxed by the states in order to avoid discrimination against national banks. Such deposits, although surely ''moneyed capital'' were thought to come from a source so vastly different from the source of capital available for investment in national banks that no threat of competition was seen (*Mercantile Nat. Bank* v. *New York, supra; First Nat. Bank* v. *Louisiana Tax Com.,* 289 U.S. 60 [53 S.Ct. 511, 77 L.Ed. 1030, 87 A.L.R. 840]).

Thus, as indicated above, the only question here presented is whether the activities of Marble relate to moneyed capital from a source in substantial competition with the source of capital available for investment in national banks. As there is no dispute in the facts and the question presented is one of law, we are free to draw our own conclusions from the record before us and are not bound by the findings and conclusions of the court below (*Whittell* v. *Franchise Tax Board,* 231 Cal. App.2d 278 [41 Cal.Rptr. 673]; *Peterson Tractor Co.* v. *State Board of Equalization,* 199 Cal.App.2d 662, 668 [18 Cal.Rptr. 800]).

Marble here argues that the trial court properly concluded that it was not a financial corporation because: (1) Marble did not hold deeds of trust as a permanent investment but bought them for institutional investors and so provided a service rather than dealing in "moneyed capital" and (2) Marble's activities were not in competition with national banks for sources of "moneyed capital."

### I. MARBLE WAS DEALING WITH COMPETING "MONEYED CAPITAL."

The fallacy of Marble's thesis that it was not a financial corporation dealing in "moneyed capital" in substantial competition with the sources of capital for national banks, is demonstrated by the leading case of *First Nat. Bank* v. *Hartford*, 273 U.S. 548 [47 S.Ct. 462, 71 L.Ed. 767, 59 A.L.R. 1]. The Wisconsin Supreme Court had upheld the state taxing statute on grounds that there was no competition with national banks, as the competitors did not derive their income *primarily* from interest (*First Nat. Bank* v. *Hartford*, 187 Wis. 290 [203 N.W. 721]). On appeal, the U.S. Supreme Court expressly rejected this analysis and held that persons purchasing mortgages for resale were in competition with national banks. The court said at pages 557 and 558: "Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of § 5219, even though the competition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. *Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command.* No decision of this Court appears to have so qualified § 5219 as to permit discrimination in taxation in favor of moneyed capital such as is here contended for. To so restrict the meaning and application of § 5219 would defeat its purpose. It was intended to prevent the fostering of unequal competition with the business of national banks by the aid of discriminatory taxation in favor of capital invested by institutions or individuals engaged either in similar businesses or in particular operations or investments like those of national banks. *Mercantile Bank* v. *New York, supra,* 155. With the great increase in investments by individuals and the growth of concerns engaged in particular phases of banking shown by the evidence in this

case and in *Minnesota* v. *First Nat. Bank of St. Paul,* today decided, *post,* p. 561, discrimination with respect to capital thus used could readily be carried to a point where the business of national banks would be seriously curtailed. *Our conclusion is that § 5219 is violated wherever capital, substantial in amount when compared with the capitalization of national banks, is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage and in the same locality in which they do business.''* (Italics added.)

The court, in discussing the limits of the powers of national banks, continued at pages 559 and 560: ''It is argued that national banks are not authorized to deal in bonds or other evidences of indebtedness and that § 5219 was not intended to protect them from discriminatory taxation in favor of moneyed capital employed in a business in which they may not engage. But it is not necessary for the purposes of this case to determine the precise limits of their powers. They are given authority, in addition to loaning money, to exercise all such 'incidental powers' as shall be necessary to carry on the business of banking 'by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt.' § 5136 Revised Statutes. They are authorized, with certain limitations, to loan money on real estate mortgages. Act of December 23, 1913, supra; Act of September 7, 1916, supra; Act of February 25, 1927, § 24. Here plaintiff is shown to have investments in real estate mortgages and to be engaged in selling them. *The sale of mortgages and 'other evidences of debt' acquired by way of loan or discount with a view to reinvestment is, we think, within the recognized limits of the incidental powers of national banks.* Compare *First Nat. Bank* v. *Anderson, supra,* 348; *Mercantile Nat. Bank* v. *New York, supra,* 156. To that extent the business of acquiring and selling such mortgages and evidences of debt, carried on by numerous individuals, firms, and corporations in Wisconsin, comes into competition with this incidental business of national banks. *That the exercise of this incidental power has become of great importance in the business of national banks appears from the Report of the Comptroller of the Currency for 1924, 44 et seq., showing that approximately one-third of the investment of national banks consist of government, railroad, public service corporation and other bonds, and 'collateral trust and other corporation notes.'* '' (Italics supplied.)

In the companion case of *Minnesota* v. *First Nat. Bank of*

*St. Paul,* 273 U.S. 561 [47 S.Ct. 468, 71 L.Ed. 774], the U.S. Supreme Court applied the standards of the *Hartford* case, *supra,* to hold invalid a Minnesota tax on national bank shares. The same standards were recently applied by the Supreme Court of New Jersey to hold that companies dealing in second mortgages were in competition with national banks (*Morris & Essex Invest. Co.* v. *Director of Div. of Taxation* (1960) 33 N.J. 24 [161 A.2d 491]).

The chief California authority is *Crown Finance Corp.* v. *McColgan,* 23 Cal.2d 280 [144 P.2d 331]. The *Crown* case raised the question of whether finance companies who were engaged exclusively in purchasing, at a discount, conditional sales contracts of household furnishings and other low priced articles of personal property from small local retail sellers of these articles, were to be regarded as "financial corporations." The finance companies never made loans but derived all of their income from the difference between the face amount of the contracts purchased, including a carrying charge thereon, and the amount at which they were able to buy these contracts. Although the finance companies made no loans, the court found that there was competition with national banks because national banks made personal loans for the purchaser of household equipment on the borrowers' credit and, in addition, national banks purchased, at a discount, conditional sales contracts from dealers in household equipment. The arrangements made by the banks differed from those made by the finance companies only in that the banks relied solely on the credit of the dealer and withheld payment of between 20 and 40 percent of the price as a reserve against default under the contract. In rejecting the contentions of the finance companies, the court said at pages 286 and 287: "The only reasonable conclusion from that evidence is that plaintiffs were in substantial competition with national banks. Both national banks and plaintiffs are engaging in the same general investment business, that is, a business where the dealing is in moneyed capital as distinguished from other commodities, and purchasing at a discount conditional sales contracts from retail dealers in household furnishings and equipment. While in all phases of the business of each there is not a parallel, that is, plaintiffs do not loan money whereas national banks do, competition may exist although it does not extend to all aspects of the business of national banks. (*See Boise City Nat. Bank* v. *Ada County,* 48 F.2d 222; *National Bank of Commerce* v. *King County,* 153 Wash. 351 [280 P. 16]; *Public Nat.*

*Bank of New York* v. *Keating,* 47 F.2d 561, aff'd 284 U.S. 587 [52 S.Ct. 137, 76 L.Ed., 507] ; *Minnesota* v. *First Nat. Bank,* 273 U.S. 561 [47 S.Ct. 468, 71 L.Ed. 774] ; *First Nat. Bank* v. *Hartford,* 273 U.S. 548 [47 S.Ct. 462, 71 L.Ed. 767] ; *First Nat. Bank* v. *Anderson, supra,* p. 348.) It is true that it was testified that the business of the national banks and plaintiffs was not similar, for the reason, however, that, contrary to plaintiffs' course of business, the national banks looked only to the dealer's credit, insisted upon recourse to the dealer, and required a reserve. The last-mentioned differences in the mode of transacting the business of investing in instruments calling for the payment of money by purchasing of conditional sales contracts, are not controlling. It cannot be doubted that for that class of business both plaintiffs and the national banks are interested in at least that group of dealers who are financially responsible and whose credit standing is sufficient to make acceptable and valuable their guarantee of payment on the contract, and who can afford to have the reserve withheld. The fact that plaintiffs deal chiefly with small local dealers does not preclude the assumption that some of those dealers may be in a position to deal with a national bank, or that national banks will accept such business when offered. *It is not logical to say that where two concerns are engaged in trading in a similar commodity (money and conditional sales contracts in the instant case) they are not in competition because one offers more favorable terms or prices than the other.''* (Italics supplied.)

■ Thus the case established that in ascertaining whether a company is a financial corporation, the question to be considered is whether or not the activities of the corporations involved dealing in money or financing in competition with those activities of national banks and that the competition with national banks may exist even though the terms and conditions of the business transactions are not identical. The case also established that the applicable standards are those established by the U.S. Supreme Court in cases under 12 United States Code Annotated section 548, and that the making of loans is not necessary to qualify a corporation as a financial corporation.

■ It is undisputed that Marble's activities consisted in dealing in first deeds of trust on real property that were initially acquired in Marble's own name and through the use of funds supplied by Marble. To obtain these funds, Marble had established lines of credit with several banks. The banks care-

fully investigated Marble's activities and extended credit to Marble on the bases of its own assets and activities and not those of its institutional investors. After Marble assigned the first deeds of trust to its various "purchasers," Marble retained a right to share in the interest payments on the loans, collected principal and interest on the loans and took all of the steps necessary to protect the security interest of the loans.

█ Marble's argument that it made loans only to support its "servicing business" is negated by the fact that the major portion of its gross income (51 to 60 percent) came from its activities prior to assignment, while the "servicing fees" accounted for only 34 to 42 percent of its gross income. Marble's contention also overlooks the fact that its agreements with its purchasers specifically provided that the "service" payments were to be retained *only out of interest* at the rate of ½ of 1 per cent per annum on the monthly unpaid balance of the mortgage debt. Partial payments were applied to principal first. Thus the so-called "service charge" was in fact a share of the interest, exactly like that retained by a national bank for servicing loans. Where loan payments were delinquent, Marble set and collected the late fees and retained them as its own without any accounting to the purchaser.

Marble's attempt to isolate its loan collection activities after assignment from the rest of its activities is analogous to a contention that when a company manufactures goods in one state and sells them in another, all of its income is earned in the selling state since it is there that the reimbursement is received. Such an approach was rejected by the U.S. Supreme Court in *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113 [41 S.Ct. 45, 65 L.Ed. 165], in sustaining a tax imposed by the manufacturing state because the profits arose from a series of activities beginning with the manufacture of the goods in one state and ending with their sale in another. Here, too, Marble is engaged in a series of activities of dealing with moneyed capital, beginning with Marble's initiating of the loan and ending with Marble's assignment of the loan to one of its purchasers and its subsequent collection activities.

█ Marble argues that because of its capitalization at $115,000, its use of funds was so minimal that it could not be considered to be in substantial competition with national banks and that it used only funds borrowed from banks to finance its acquisition of mortgage loans. The record shows, however, that in 1955 Marble used over $295,000 of unborrowed funds in financing the acquisition of mortgage loans; in

1956, $270,000; and in 1957, $331,000. Nor does the fact that Marble relied primarily on funds borrowed from banks to finance its acquisition of deeds of trust serve to distinguish its activities from those of national banks who borrow most of their funds from their depositors or from federal reserve banks. In borrowing funds on its line of credit, Marble incurred liability to the bank. The banks made loans to Marble on the basis of its established line of credit, as well as the pledged deeds of trust for security. If, as Marble argues, it was only an agent of its purchasers, the banks would have looked to the credit of the purchasers rather than Marble.

Marble asserts that it did not make any construction loans on its own account. However, the record indicates that while Marble often had arrangements for the assignment of the loans after construction was completed, it did supply funds for the construction loans and frequently carried them until completion. The record also indicates that in 1956 Marble loaned $206,000 on construction loans that were never assigned but were paid off on completion of construction.

■■■ We conclude that Marble's fees for making and servicing construction loans, its ''point'' charges for making federally insured loans, and in fact all of its preassignment earnings, were charges for lending moneyed capital rather than for rendering a mere service to its institutional purchasers.

## II. MARBLE'S ACQUISITION, FINANCING AND HANDLING DEEDS OF TRUST WAS IN SUBSTANTIAL COMPETITION WITH NATIONAL BANKS

■■■ Marble is in substantial competition with national banks, first, because the acquisition of deeds of trust by Marble reduces the investment opportunities available to banks, and, second, because the income received by Marble as the result of making loans on first deeds of trust is of the same type as the income earned by banks in dealing with mortgages.[2] Marble is in most direct competition with national banks in reducing the opportunities available to them to acquire deeds of trust for sale to institutional investors. As indicated above, Marble dealt primarily with nonconventionally insured long term first deeds of trust, the kind usually sought by institutional investors. The sale of mortgages acquired by way of loan or discount

---

[2]The terms ''mortgages'' and ''deeds of trust'' are used interchangeably since the agreements with purchasers refer to mortgages, but the California practice generally involves the use of deeds of trust.

with a view to reinvesting is an activity in competition with national banks (*First Nat. Bank* v. *Hartford*, 273 U.S. 548 [47 S.Ct. 462, 71 L.Ed. 767, 59 A.L.R. 1]). The record here established that in 1957, the Bank of America in Los Angeles County alone assigned over 1,000 deeds of trust to institutional investors similar to those to whom Marble assigned mortgages and, like Marble, the Bank of America did so shortly after making the loan.

Marble argues that the "service fees" it received for servicing the loans of the institutional investors was not the same type of income as the interest earned by national banks on first deeds of trust. However, as indicated above, on analysis, it is readily apparent that one segment of the interest received by banks constitutes compensation for the performance of functions similar to those here performed by Marble, namely, the acquisition of the mortgage including the necessary appraisals and the collection of the payments on the loan. The banks are taxed at the bank rate with respect to all profits attributable to such activities. It would be discriminatory to allow mortgage companies like Marble to pay taxes at a lower rate for the earning of profits obtained from the performance of functions identical to those performed by national banks in relation to mortgages.

The uncontroverted evidence of Marble's own witnesses indicated that Marble was competing with national banks for the acquisition of deeds of trust. J. R. Jones, a former officer of Security National Bank and qualified as an expert in the field of mortgage lending, indicated that when the money market is good, banks and insurance companies compete intensely for loans on first liens in real estate. Another banker, Mr. LeMasters, indicated that banks and insurance companies compete for mortgage loans even though the approaches of the two are different because insurance companies are less restricted as to the amount and duration of loans that they can make. If Marble is competing with banks for mortgage loans, and is able to offer better terms because banks are more restricted, its competitive advantage is all the greater. As our Supreme Court said in *Crown Finance Corp.* v. *McColgan*, 23 Cal.2d 280, 287 [144 P.2d 331] : "It is not logical to say that where two concerns are engaged in trading in a similar commodity (money and conditional sales contracts in the instant case) they are not in competition because one offers more favorable terms or prices than the other."

The uncontroverted evidence indicated that a large

number of the deeds of trust entered into by Marble were secured by the F.H.A. or V.A. Such conventionally secured deeds of trust are governed by federal statutory provisions and their terms are standard, regardless of whether the loan is initiated through a national bank, mortgage company or insurance company. As to these loans, Marble is clearly in competition with national banks. Also, as previously indicated, Marble engaged in a number of short term construction loans where it assumed all of the risks, the institutional purchasers being interested only in long term loans on completed structures.

The cases relied on by Marble do not sustain its position. Marble argues that the recent case of *Michigan Nat. Bank* v. *Michigan,* 365 U.S. 467 [81 S.Ct. 659, 5 L.Ed.2d 710], leaves no doubt that Marble and similar organizations are not in competition with national banks. However, at page 470, the court said it would assume, without deciding, that savings and loan institutions were in competition with national banks "in a substantial phase of the business carried on by national banks, i.e., residential mortgage loans." The court then concluded that despite this assumed competition, the tax structure of the state did not discriminate against national banks. The case simply held that even though a corporation is a financial corporation, it may be taxed in a different manner from banks, if the state chooses to do so, provided the end result does not discriminate against national banks. The question is not reached under the law of this state as California has chosen to tax financial corporations by the same method as banks. The opinion, however, does emphasize, at pages 471 and 472, the growing role that mortgage investments have played in banking activities since 1934.

Marble also attempts to find support for its position in *Hoenig* v. *Huntington Nat. Bank of Columbus* (6th Cir. 1932) 59 F.2d 479, wherein the court concluded that certain companies that procured mortgages for insurance companies were properly regarded as agents of the insurance companies. The court, as an alternative ground, concluded that even if the mortgage companies were in competition with national banks, there was no discrimination under the system of taxation therein applied. In the *Hoenig* case, however, there was no indication that there were contracts with the insurance companies expressly providing that the mortgage companies were independent contractors, as in the instant case. Furthermore, as pointed out in the dissenting opinion in *Hoenig,* the majority opinion is not consistent with the decision of the U.S.

Supreme Court in *First Nat. Bank* v. *Hartford,* 273 U.S. 548 [47 S.Ct. 462, 71 L.Ed. 767, 59 A.L.R. 1], which this court is bound to follow.

Nor is the possible tax treatment of insurance companies relevant to the instant case, since article XIII, section 14 4/5 of our state Constitution prescribes the tax to be applied to insurance companies. Accordingly, we need not consider whether insurance companies would be classified as financial corporations if they were taxable under the Bank and Corporation Franchise Tax Act instead of the system presently provided.

 As indicated above, Marble argues that it was merely an agent of the institutional investor and acted only as a conduit. However, an examination of the terms of the contractual arrangements between Marble and its institutional purchasers clearly demonstrates that Marble acted as an independent contractor. For example, paragraph 5 of the agreement between Marble and Western Saving Fund Society provided that Marble, as an independent contractor, reserved certain rights and assumed certain duties in respect to each mortgage purchased. To further illustrate Marble's independent status, paragraph 9 of this agreement provided that Marble was to retain a right to ˙a portion of the interest received and the late charges without accounting therefor to Western. In addition, if the contractual arrangement is terminated without Marble's fault, Western must compensate Marble for the loss. A similar provision was contained in Marble's 1942 agreement with Provident Mutual Life Insurance.

Marble's balance sheets for the period here in issue demonstrate its liability for the repurchase of loans assigned for a period of at least six months. The grounds on which Provident could require Marble to repurchase deeds of trust were so broad as to include dissatisfaction on Provident's part with the information received from Marble about "the general suitability of the borrower or tenant from an occupational and moral viewpoint."

Marble's argument that its field of operation is essentially different from that of national banks is not persuasive. As indicated in *Crown Finance Corp.* v. *McColgan,* 23 Cal.2d 280 [144 P.2d 331], the activities of a corporation need not be identical to those performed by a national bank in order to constitute "substantial competition." In *Morris & Essex Invest. Co.* v. *Director of Div. of Taxation,* 33 N.J. 24 [161

A.2d 491], the court emphasized that allowing companies deal-ing in second mortgages to have a lesser tax burden than national banks dealing in first mortgages would result in a differential in profitability that would discriminate against national banks. The court said at page 497: "Assuming that national banks take only first mortgages and the petitioner only second mortgages, it does not follow that they are not in competition. From the point of view of a landowner with an existing lien held by a national bank, who wishes to borrow additional money, they are certainly in competition. He may recast his first mortgage, obtain an additional loan from the national bank on other security, or seek a second mortgage with someone else.

"From the point of view of a prospective homeowner also, second mortgage lenders and national banks are in competi-tion. He is in a position to seek the maximum loan a national bank will give him on the security of his property, or to seek a small secured loan from the bank and then obtain additional money from a second mortgage company by giving it a subse-quent lien. This may seem to be a fanciful case, but it would not be if second mortgage companies escaped a tax burden thrown on the national banks and thus could operate profit-ably while charging a smaller interest rate for money lent. It was just this kind of differential in profitability and therefore in ability to attract capital, that the federal statutory provi-sion was designed to guard against." (Cf. *Title Guarantee Loan & Trust Co.* v. *State* (1934) 228 Ala. 636 [155 So. 305], holding that a title guarantee company was in substantial competition with the loan and investment business of national banks.)

### III. ADMINISTRATIVE PRACTICE AND CONSTRUCTION.

Finally, Marble argues that the state's long adminis-trative practice that should not be overturned is to treat corporations like Marble as general corporations and not as financial corporations. Marble relied on *Richfield Oil Corp.* v. *Crawford*, 39 Cal.2d 729 [249 P.2d 600], which held that the court would not disturb a settled administrative construction, consistent for a period of 19 years. The stipulation in the instant case, however, reveals no consistent administrative policy or practice applied between the years 1932 and 1957. In any event, we are not bound by such practice. The parties are agreed that the question involved here is one of law and that the case is of first impression in this state.

We conclude that Marble's activities concerned moneyed capital and were in substantial competition with national banks. The judgment is reversed and the trial court is directed to enter findings and a judgment consistent with this opinion. Each party will bear its own costs on appeal.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied April 20, 1966.